711 A.2d 260

THOMAS TRANTINO, APPELLANT AND CROSS–RESPONDENT, v. NEW JERSEY STATE PAROLE BOARD AND NEW JERSEY STATE DEPARTMENT OF CORRECTIONS, RESPONDENTS AND CROSS–APPELLANTS.

THOMAS TRANTINO, APPELLANT AND CROSS–RESPONDENT, v. NEW JERSEY STATE PAROLE BOARD, SUPERINTENDENT DONALD E. LEWIS AND NEW JERSEY STATE DEPARTMENT OF CORRECTIONS, RESPONDENTS AND CROSS–APPELLANTS.

Argued October 6, 1997—Decided May 15, 1998.

*Roger A. Lowenstein* argued the cause for appellant and cross-respondent.

*Howard J. McCoach*, Deputy Attorney General, argued the cause for respondents and cross-appellants (*Peter Verniero*, Attorney General of New Jersey, attorney; *Joseph L. Yannotti* and *Mary C. Jacobson*, Assistant Attorneys General, of counsel; *Mr. McCoach, Jennifer L. Kleppe, Dianne M. Moratti* and *Andrew R. Sapolnick*, Deputy Attorneys General, on the briefs).

The opinion of the Court was delivered by

HANDLER, J.

This appeal, before us as a matter of right pursuant to *Rule* 2:2–1(a)(2), concerns the criteria upon which inmates sentenced to prison terms under Title 2A, which has been repealed and superseded, are to be adjudged when seeking parole and whether those standards were properly applied to appellant, Thomas Trantino.

The basis for the appeal is the New Jersey State Parole Board's decision denying Thomas Trantino parole and deferring future parole eligibility for ten years. That decision was based on earlier administrative decisions relating to Trantino's parole status. One of those decisions rendered by the Parole Board granted Trantino parole conditioned on his transfer to a halfway house. The New Jersey State Department of Corrections (DOC), however, rejected the Parole Board's transfer request. That refusal led to the Parole Board's final decision denying parole.

The issues on appeal posed by the dissent are whether the evidence demonstrates that Trantino is fit for parole and, therefore, whether the Parole Board abused its discretion in denying parole. The appeal also presents issues raised by the State's petition for certification, *see* 150 *N.J.* 24, 695 *A.*2d 667 (1997) (granting certification), including the validity of the DOC's denial of Trantino's application for transfer to a halfway house.

The Appellate Division determined that the DOC's refusal to transfer Trantino to a halfway house was invalid, but that the Parole Board's subsequent denial of parole was based on sufficient evidence and, therefore, was not an abuse of discretion. 296 *N.J.Super.* 437, 462–70, 687 *A.*2d 274 (1997). Accordingly, the court remanded the matter to the DOC to reconsider its refusal to provide halfway house treatment. *Id.* at 471, 687 *A.*2d 274.

We affirm the Appellate Division judgment invalidating the DOC's decision refusing to provide halfway house treatment. We also set aside the judgment insofar as it sustains the Parole Board's final decision denying parole and fixing an extended future parole eligibility date. Although we concur in much of the

analysis and reasoning set forth in the comprehensive opinion of Judge Stern, as well as that of the dissenting opinion of Judge Pressler, we do not find that the Parole Board's decision was based on a proper standard and supported by sufficient evidence and adequate findings of fact. In reaching that conclusion, we clarify the standard governing parole eligibility under the circumstances of this case, particularly the requirement of rehabilitation as a basis for parole. Our determination requires the Parole Board to reconsider the evidence. Accordingly, we modify the remand ordered by the Appellate Division and direct the Parole Board to redetermine Trantino's parole eligibility.

I

On August 23, 1964, Thomas Trantino was found guilty of one count of murder in the first degree and was subsequently sentenced to die. The circumstances surrounding not only this slaying, but also the contemporaneous murder of another victim, are detailed in *State v. Trantino,* 44 *N.J.* 358, 361–63, 209 *A.*2d 117 (1965), *cert. denied,* 382 *U.S.* 993, 86 *S.Ct.* 573, 15 *L.Ed.*2d 479 (1966), *reh'g denied,* 383 *U.S.* 922, 86 *S.Ct.* 901, 15 *L.Ed.*2d 679 (1966).

Trantino remained on death row until 1972 when the New Jersey death penalty statute was declared unconstitutional. *See State v. Funicello,* 60 *N.J.* 60, 286 *A.*2d 55, *cert. denied,* 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972). His sentence was commuted to one term of life imprisonment, *nunc pro tunc* as of the date the death sentence was initially imposed.

The extensive history of Trantino's record in prison and his continuing efforts to achieve parole are recapitulated in great detail in the opinions of Judges Stern and Pressler, and in the concurring opinion of Judge Humphreys. That history remains highly relevant to the issues on this appeal, namely, whether the Parole Board applied the proper standard governing the parole of an inmate sentenced under Title 2A and, further, whether there were adequate factual findings based on substantial evidence

sufficient to support the Parole Board's determination denying parole.

■ In addressing the validity of the Parole Board's denial of parole, the judicial role concentrates on three inquiries: (1) whether the agency's action violates express or implied legislative policies, *i.e.*, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors. *Brady v. Department of Personnel,* 149 *N.J.* 244, 256, 693 *A.*2d 466 (1997). Thus, we must first consider whether the Parole Board applied the correct legal standard for determining parole. *See Beckworth v. State Parole Bd.,* 62 *N.J.* 348, 368, 301 *A.*2d 727 (1973) (Sullivan, J., concurring) (observing that "judicial review of Parole Board matters is limited to a consideration of whether guidelines and principles have been substantially satisfied, and ordinarily will not involve the review of the merits of the Parole Board decision"). Then, because the "question whether there is a substantial likelihood an inmate will commit another crime if released" is "essentially factual in nature," we "must determine whether the factual finding could reasonably have been reached on sufficient credible evidence in the whole record." *State Parole Bd. v. Cestari,* 224 *N.J.Super.* 534, 547, 540 *A.*2d 1334 (App.Div.) (citation omitted), *certif. denied,* 111 *N.J.* 649, 546 *A.*2d 558 (1988).

■ The standard of review is strongly influenced by the fact that the substantive principles governing parole do not confer a constitutional right or entitlement. *State Parole Bd. v. Byrne,* 93 *N.J.* 192, 208, 460 *A.*2d 103 (1983); *In re Trantino Parole Application,* 89 *N.J.* 347, 363 n. 5, 446 *A.*2d 104 (1982); *accord Connecticut Bd. of Pardons v. Dumschat,* 452 *U.S.* 458, 463–64, 101 *S.Ct.* 2460, 2464, 69 *L.Ed.*2d 158, 164 (1981); *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex,* 442 *U.S.* 1, 7, 99 *S.Ct.* 2100, 2104, 60 *L.Ed.*2d 668, 675 (1979). However, while there

is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," *Greenholtz, supra,* 442 *U.S.* at 7, 99 *S.Ct.* at 2104, 60 *L.Ed.*2d at 675, there is by statute a "protected expectation of parole in inmates who are eligible for parole," *Byrne, supra,* 93 *N.J.* at 206, 460 *A.*2d 103.

We recognize that Parole Board determinations are highly "individualized discretionary appraisals," *Beckworth, supra,* 62 *N.J.* at 359, 301 *A.*2d 727, and, therefore, Parole Board decisions should not be reversed by a court unless found to be arbitrary, *Monks v. State Parole Bd.,* 58 *N.J.* 238, 242, 277 *A.*2d 193 (1971), or an abuse of discretion, *State v. Lavelle,* 54 *N.J.* 315, 322, 255 *A.*2d 223 (1969). Nevertheless, the inherent difficulty in gauging whether a parole determination constitutes an abuse of discretion does not engender a more exacting standard of judicial review than that applicable to other administrative agency decisions. *See In re Hawley Parole Application,* 98 *N.J.* 108, 112, 484 *A.*2d 684 (1984) (finding "no reason to exempt the Parole Board from the well-established principle" and generally accepted standard of review applicable to administrative agencies); *Cestari, supra,* 224 *N.J.Super.* at 548 n. 60, 540 *A.*2d 1334 ("reject[ing] the contention that a more restrictive standard of judicial review should apply to parole [decisions] than to other administrative agency decisions"); *cf.* 296 *N.J.Super.* at 470, 687 *A.*2d 274 (stating that court must "not upset [parole decisions] unless it clearly and convincingly appears that the Board has abused its discretion" (citation omitted)). Cognizant of this standard of review, we explain initially the criteria that govern parole in the circumstances of this case.

II

Trantino is serving a sentence imposed under Title 2A, the predecessor criminal statute to the New Jersey Code of Criminal Justice, now codified under Title 2C. Title 2A and Title 2C have different approaches to sentencing that affect parole. *Trantino Parole Application, supra,* 89 *N.J.* at 370, 446 *A.*2d 104. Because

a sentence of imprisonment imposed under Title 2C incorporates parole disqualification as a sentencing element, inmates serving such sentences "will have presumptively satisfied all punitive aspects of their sentences at the time they become eligible for parole." *Ibid.* In contradistinction, prison terms imposed under Title 2A did not expressly include parole disqualification, and consequently, "the punitive aspects of [the] sentences [of Title 2A inmates] will not necessarily have been fulfilled by the time parole eligibility has occurred." *Ibid.* For that reason, the determination of parole of a 2A inmate must take into account the punitive aspects of the sentence.

Even though punishment is a factor in determining parole for a pre-Code inmate, punishment, as retribution or general deterrence, is not to be considered an end in and of itself. However, the gravity and enormity of the underlying crime implicates the need for punishment as individual deterrence. Hence punishment in that sense may be considered in the parole determination, but only insofar as it "relate[s] to the rehabilitative prospects of the inmate and his likelihood of recidivism if released." *Id.* at 372–73, 446 *A.*2d 104.

Rehabilitation as a consideration of parole fitness emphasizes the likelihood that the inmate will commit crimes if released on parole. This focus on criminal recidivism is derived from the changing statutory basis for parole. Under the Parole Act of 1948, the Parole Board, in determining whether to release an inmate on parole, was required to find "that there is reasonable probability that, if such prisoner is released, he will assume his proper and rightful place in society, without violation of the law, and that his release is not incompatible with the welfare of society." *N.J.S.A.* 30:4–123.14 (repealed by *L.* 1979, *c.* 441, § 27); *see Beckworth, supra,* 62 *N.J.* at 360, 301 *A.*2d 727 ("The statutory criteria in *N.J.S.A.* 30:4–123.14 contemplate parole release only where the Board is of the opinion both (1) that there is reasonable probability that the inmate will be lawabiding and (2) that the release is compatible with society's welfare."). In determining

whether parole would be "incompatible with the welfare of society," the Parole Board could consider whether release "would promote disrespect for law" or "have a substantially adverse effect on institutional discipline," or whether "continued correctional treatment" would "substantially increase the inmate's capacity to lead a law-abiding life." *Id.* at 361, 301 *A.2d* 727 (internal citation omitted). This standard was changed under the Parole Act of 1979, *N.J.S.A.* 30:4–123.45 to –123.69. No longer was the Parole Board required to assess whether the inmate had achieved such a high level of rehabilitation that he was fit to assume a responsible role in society that was compatible with the public welfare. Similarly, "punishment that serve[d] society's need for general deterrence or a concern for retribution" was no longer "truly relevant" for parole determinations. *Trantino Parole Application, supra,* 89 *N.J.* at 372, 446 *A.2d* 104. Rather, for purposes of parole, consideration of punishment was limited solely to rehabilitation encompassing individual deterrence, *i.e.,* is there a "substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole." *N.J.S.A.* 30:4–123.56c. As applied to a prisoner serving a sentence under Title 2A, the current standard for parole fitness incorporates a selective and limited consideration of punishment that informs the basic inquiry whether it "appears by a preponderance of the evidence that there is a substantial likelihood of future criminal activity if [the prisoner] is released." *Trantino Parole Application, supra,* 89 *N.J.* at 377, 446 *A.2d* 104.

## III

The first issue here presented is whether the Parole Board applied the correct standard governing parole. Resolution of that issue, in turn, will frame the central issue to be determined, namely, whether the Parole Board's decision to deny parole was adequately supported and explained. Accordingly, we must examine the reasons and grounds for the Parole Board's several decisions and ultimate determination denying Trantino parole.

The Appellate Division recounted in detail this procedural and decisional history, 296 *N.J.Super.* at 439–59, 687 *A.*2d 274, which we adopt and incorporate.

The recent history of Trantino's parole proceedings discloses that on September 18, 1991, the Parole Board denied Trantino parole and imposed a three-year parole ineligibility date (FET). *Id.* at 449, 687 *A.*2d 274. It concurrently urged him "to make every effort to achieve halfway house status in order for the Board to evaluate his behavior in a less structured environment." *Ibid.* (quoting Parole Board decision of September 18, 1991). Within a month, Trantino requested that the Superintendent of Riverfront State Prison authorize his transfer to a halfway house. *Ibid.* On December 31, 1991, the Prison Superintendent orally disapproved that request; this disapproval was confirmed in writing on April 21, 1992. *Ibid.* Although Trantino became eligible for parole again in June 1992, the Parole Board panel deferred any determination until further in-depth psychological evaluations could be completed. *Id.* at 449–50, 687 *A.*2d 274.

On April 2, 1993, a two-member panel of the Parole Board again considered whether Trantino should be released on parole. *Id.* at 450, 687 *A.*2d 274. The panel split, with one member voting to release Trantino and the other, "believing that halfway house placement was essential to parole for someone incarcerated as long as Trantino," voting to deny. *Ibid.* At a hearing for reconsideration on November 12, 1993, both members of the panel were critical of the fact that not only was Trantino denied placement in a halfway house, but also that the DOC had not even provided written reasons for the denial. *Id.* at 450–51, 687 *A.*2d 274. Because it believed halfway house placement was a critical pre-condition to release on parole, the panel felt constrained to deny parole. *Id.* at 451, 687 *A.*2d 274. Trantino thereafter again requested that the DOC transfer him to a halfway house; the DOC did not respond. On December 17, 1993, the Parole Board reiterated its determination that satisfactory completion of a stay

at a halfway house was an essential condition for parole. *Id.* at 452–53, 687 *A.*2d 274.

Trantino promptly, on January 11, 1994, renewed his request for a transfer to a halfway house. *Id.* at 454, 687 *A.*2d 274. On February 2, 1994, the DOC again denied Trantino's application for transfer, giving as the only reason: "seen for community release." *Ibid.* (In a letter to an internal affairs investigator, the superintendent stated that the decision rested in part on the fact that the DOC received three anonymous letters threatening Trantino's life. *Id.* at 454–55, 687 *A.*2d 274.) Faced with the DOC's continued refusal to transfer Trantino to a halfway house, a two-member panel of the Parole Board, on September 1, 1994, again denied parole. *Id.* at 455, 687 *A.*2d 274.

Trantino filed administrative appeals to the full Parole Board from the November 12, 1993 and September 1, 1994 denials of parole. *Id.* at 456, 687 *A.*2d 274. On April 26, 1995, the Parole Board considered and denied these appeals without explanation. *Ibid.*

Trantino then appealed to the Appellate Division challenging the several decisions that eventuated in the denial of parole. *Id.* at 457, 687 *A.*2d 274. However, the Parole Board vacated its decision of April 26, 1995, and the Appellate Division dismissed the appeal without prejudice so that Trantino might exhaust his administrative remedies. *Ibid.*

In September 1995, a two-member panel of the Parole Board again conducted a plenary hearing, denied Trantino parole, and recommended a FET "beyond administrative guidelines." *Id.* at 457–58, 687 *A.*2d 274. Another hearing was held by a three-member panel in December 1995, and, because the panel could not agree unanimously, a full Board review followed. *Id.* at 459, 687 *A.*2d 274. On May 20, 1996, the Parole Board issued a written "notice of decision" formally denying parole and establishing the ten-year parole ineligibility term. *Ibid.*

The standard the Parole Board applied in determining Trantino's parole fitness is disclosed by the Board's several decisions. For example, in the decision of November 12, 1993, in which the two-member panel denied parole and recommended halfway house treatment as a condition of parole, the panel "acknowledge[d] that Mr. Trantino *has* reached his rehabilitative potential within the confines of his current state prison setting." *Id.* at 453, 687 *A.*2d 274 (quoting Parole Board decision of December 17, 1993). The panel noted "his long and difficult path towards real and not superficial rehabilitation," and it "believe[d] that he cannot be judged to have reached his true and full rehabilitative potential until and unless he has achieved an intensive, therapeutic and rigorously supervised, gradual reintegration into society." *Ibid.* The panel felt that only through a "reintegration process" could it be determined "if this man has been fully rehabilitated." *Ibid.* The panel concluded that satisfactory treatment at a halfway house was the only means by which Trantino could achieve his "true and full rehabilitative potential." *Ibid.* , Similarly, the September 14, 1994 denial of parole was premised on the conclusion that "Trantino has not reached his full rehabilitative potential" and "can not be said to be completely and totally rehabilitated." *Id.* at 456, 687 *A.*2d 274 (quoting Parole Board decision of September 1, 1994, as set forth in its decision of April 26, 1995).

While the Parole Board did not disregard recidivism as the criterion of the parole-fitness standard, the Board's several decisions indicate that it applied a parole standard that concentrated on whether Trantino had made sufficient progress toward "reintegration into society," was "fully rehabilitated," had realized "his real rehabilitative potential," had reached his "true and full rehabilitative potential," and had achieved "real and not superficial rehabilitation" and "complete[ ] and total[ ] rehabilitat[ion]." The Board also found a "substantial likelihood" that Trantino would "commit a crime if released on parole." *Id.* at 447, 687 *A.*2d 274 (quoting the May 20, 1996 written Parole Board decision confirming its April 3, 1996 denial of parole). That finding, however, was made in conjunction with its determination that Trantino had

failed to reach his full rehabilitative potential and total rehabilitation. It thus appears that the Parole Board considered that rehabilitation and recidivism were cognate criteria. The test for parole fitness, we repeat, is whether there is a substantial likelihood the inmate will commit a crime if released on parole. Rehabilitation is relevant under that test only as it bears on the likelihood that the inmate will not again resort to crime. It need not be total or full or real rehabilitation in any sense other than there is no likelihood of criminal recidivism.

The Appellate Division concluded that the Parole Board had rested its determination not only on a discretionary assessment of intangibles, see *Greenholtz, supra,* 442 *U.S.* at 9–10, 99 *S.Ct.* at 2103–04, 60 *L.Ed.*2d at 677–79, but also on the objective reports of the last two psychologists who evaluated Trantino. 296 *N.J.Super.* at 468–70, 687 *A.*2d 274. The Appellate Division acknowledged the particularly heinous, vicious and reprehensible nature of the murders of forty-year old Sgt. Peter Voto of the Lodi police force and twenty-one year old police trainee Gary Tedesco. Both victims were beaten, ordered to strip partially, and shot in cold-blood.[1] The court further noted Trantino's clinical diagnosis as an "antisocial character, polysubstance abuse," his previously demonstrated absolute inability to function in society as a supervised parolee,[2] the length of his incarceration and consequent insulation from the stresses and temptations of society, and the Board's consistent position that Trantino's reintegration into society must be "intensive, therapeutic and rigorously supervised." *Id.* at 440–41, 470, 687 *A.*2d 274. Accordingly, the Appellate Division con-

---

[1] Despite the fact that Trantino was fully implicated in the brutal slayings of both Sgt. Voto and police trainee Tedesco, Trantino was, for reasons unknown, indicted only for one count of murder and thus is currently serving only one term of life imprisonment. *See* 296 *N.J.Super.* at 440, 687 A.2d 274. Nevertheless, even if Trantino had been sentenced to two terms of life imprisonment, he would, under the parole statute then in effect, *N.J.S.A.* 30:4–123.11 (repealed), still be eligible for parole at this time.

[2] The murders for which Trantino is currently imprisoned were committed while he was on parole.

cluded that the Parole Board's most recent denial of parole cannot be said to be an abuse of discretion. *Ibid.*

We must, however, examine the predicate question of whether the Parole Board applied the proper standard of parole release.

It is not clear whether the Parole Board invoked a test that focuses primarily and essentially on the likelihood of criminal recidivism or whether it followed the more exacting and difficult test of full or complete rehabilitation that assures not only that an inmate will continue to lead a law-abiding life, but also that he or she will assume a responsible role in society consistent with the public welfare. It is, therefore, equally unclear whether the Parole Board's findings of fact were adequately tailored to the correct test and whether the underlying evidence was sufficient to support a determination conforming to that test.

Trantino's prison record plainly is material in determining whether he has achieved a level of rehabilitation such that he has been sufficiently deterred and there is no likelihood of recidivism. That record discloses substantial evidence of significant rehabilitation tending to demonstrate that Trantino has overcome any likelihood of recidivism. He has had no substance abuse violations in prison and no rules infractions since 1970. Trantino has already participated in sixty-nine work and recreation details that involved excursions into the community and has gone on overnight furloughs without incident. Further, he has completed seventeen programs designed to enable him to help fellow inmates and has been in individual and group psychotherapy for the past twenty-five years. Finally, Trantino's supervisors in prison have consistently rendered favorable reports.[3]

---

[3] A Senior Corrections Officer declared in 1992 that Trantino "poses no problems or risk on the unit." Also, a Storekeeper within the prison system wrote to the Parole Board:

> I tell my staff on the first day of employment, that no inmate is a friend and the only inmate they can trust is Thomas Trantino. I respect and like Thomas Trantino as a person. In another time, another place and under

Psychological evidence also supports a determination of substantial rehabilitation militating against the likelihood of recidivism. Dr. James Bell, one of two evaluating psychologists, said in his July 1995 report: "[W]ithin the prison system, [Trantino] has been an exemplary inmate and not only has invested in several programs to improve himself, but also has started several programs to assist youthful delinquent offenders and substance abusers." *Id.* at 487, 687 *A.*2d 274 (Pressler, J., dissenting) (quoting July 1995 report of Dr. Bell). Dr. Bell further stated in his report:

Clinically, he impresses as a man who has reached a point of change come about through sincere self-inventory and aspirations to atone for the great wrong he has done in his life. He has adequate mental and emotional resources to live a socially responsible, self-reliant life. His PASS score of 66% suggests an above average possibility of post-release success.

[*Ibid.*]

An August 1995 evaluation by Glenn Ferguson, the other evaluating psychologist, states:

Presently, Thomas [Trantino] functions more as a staff member in the prison than as an inmate. He has developed a well-rounded and reputable support network which should enable Thomas to manage the increased stress level of independent living optimally. He has a high level of motivation for continued education, therapy and employment. His employment plans appear realistic and attainable, including technical work with his wife's copyrighting company and creative work in art and therapy. . . . The combination of well-established social supports, motivation for ongoing treatment, and age will most likely lead to a successful parole outcome.

The Parole Board itself acknowledged "Mr. Trantino's charge free institutional adjustment, program participation and full minimum custody in mitigation." *Id.* at 456, 687 *A.*2d 274 (quoting the Board's April 17, 1995 statement of reasons explaining its denial of parole on September 1, 1994).

The Parole Board based its successive denials of parole in large measure on the fact that Trantino was avoiding responsibility for

different circumstances I would call him "A Friend[,]" a title I dispense sparingly.

Thomas Trantino has given much of his life to Penal Institutions and I feel that he has something left in a positive sense to offer society if given the opportunity to do so.

these crimes. As expressed by the Parole Board's Adult Panel in one decision:

> During this panel hearing Mr. Trantino was once again in doubt as to whether he in fact murdered the police officers, stating "I am not capable of killing those two men. I could not have done that." This is of great concern to this panel. Until and unless Mr. Trantino can completely, honestly, openly and consistently confront and fully admit his role in these murders, he can not be said to be completely and totally rehabilitated as per the Court's holding in the original Trantino decision.

> [*Ibid.*]

The stated basis for the Parole Board's conclusion that Trantino was avoiding responsibility for his crimes is Trantino's claimed memory loss. The two-member panel, in its September 25, 1995 decision, "acknowledged that Trantino had made great strides towards achieving his rehabilitative potential over the course of the preceding thirty-two years, but found that his rehabilitative potential had not been reached due to his failure to remember certain aspects of the crime." *Id.* at 458, 687 *A*.2d 274. As stated by one Board member:

> It is the Panel's belief that your failure to remember certain details regarding the murder is inhibiting you from reaching your rehabilitative potential. In sum, the Adult Panel is of the position that until you can remember specific events regarding the murder, including firing the gun that killed Sgt. Voto, you will not be able to fully accept your role in the crime and will not achieve your rehabilitative potential. Therefore, the Panel believes there is a substantial likelihood you will commit a crime if released on parole.

> [*Id.* at 458, 687 *A*.2d 274 (quoting Board's September 25, 1995 notice of decision regarding the September 14, 1995 parole hearing).]

In short, the "memory loss has always been a key ingredient in the parole deliberations." (Parole Board hearing of October 9, 1990).

To support its conclusion that Trantino is avoiding responsibility by feigning memory loss, the Parole Board refers to Dr. Bell's observation that Trantino

> believes that his co-defendant shot the victims but cannot recall specific aspects of the event, because he was in an alcohol/speed blackout and in fact, may have been experiencing hallucinations related to this substance abuse. He recalls fist fighting with one victim and having a gun in his left hand but continues that he did not discharge it, and thinks he left the bar before the man was shot.

Nevertheless, there is evidence in the record that Trantino's memory loss is consistent, long-standing and genuine, and, beyond the issue of recollection, his acknowledgement of responsibility is sincere and legitimate. That Trantino acknowledges and accepts responsibility for his crimes is disclosed in the record of his numerous parole proceedings. The Appellate Division noted that "[o]n May 8, 1995, Trantino, in a letter to the Chairman of the Parole Board, requested an appeal" and "proffered additional evidence that he acknowledged that he killed the two police officers and that he was deeply ashamed and suffers for what he did." *Id.* at 457, 687 *A.2d* 274. Since 1988 Trantino repeatedly told the Board in unequivocal terms that he accepts responsibility for having murdered both men even though he cannot remember the details because of his alcoholic/drugged state. *See, e.g.,* at the 1988 parole hearing ("I have no memory of it. The evidence is there. I don't want to argue with the evidence anymore. And I will accept responsibility."); at the April 2, 1993 parole hearing (Q. "Number one, did you kill Peter Voto?" A. "Yes." Q. "Number two, did you kill [Gary] Tedesco?" A. "Yes. . . . I don't have a conscious memory of it—" Q. "But you fully and totally acknowledge that you killed both of those gentlemen?" A. "Yes."); at the September 1, 1994 parole hearing ("I accept responsibility—altogether. . . . I have just no memory of it."); at the September 14, 1995 parole hearing ("I didn't say that I didn't. I say I did. I say I have no conscious memory of it. I have said I have committed this murder. I am responsible for both murders."); at the December 11, 1995 parole hearing ("'To repeat once again, there is no doubt in my mind that I am responsible for and guilty of killing Mr. Voto and Mr. Tedesco.").

This history is corroborated by Dr. Bell, who, in the same report cited by the Parole Board, noted that Trantino's "recounting includes assertions on his part that he takes full responsibility for the crime." The August 1995 psychological evaluation by Glenn Ferguson reaches a similar conclusion: "[Trantino] has consistently claimed no recollection of the actual offense, although he accepts full responsibility for both murders, in light of eye

witness testimony, and his recollection of holding a gun both prior to and after the offense."

We acknowledge that the fact that the two psychologists who most recently examined Trantino indicated that he was fit for parole may not be dispositive. *See In re Registrant G.B.*, 147 *N.J.* 62, 87, 685 *A.*2d 1252 (1996) (noting that for purposes of sex offender registry, courts must take care not "to abdicate decision-making responsibility to experts"); *In re D.C.*, 146 *N.J.* 31, 59, 679 *A.*2d 634 (1996) (finding that for purposes of involuntary commitment proceeding, "the final determination of dangerousness lies with the courts, not the expertise of psychiatrists and psychologists"); *State ex rel. C.A.H. & B.A.R.*, 89 *N.J.* 326, 343, 446 *A.*2d 93 (1982) (finding that for purposes of juvenile waiver hearing, court is not required to give controlling effect to experts, but rather must weigh the evidence in "light of common sense and experience"). Nevertheless, we do not find a sufficient basis or an adequate explanation for the Parole Board's rejection of the conclusions of the psychologists.

The Parole Board's final decision that Trantino was not ready for parole and would not be eligible for parole for a period of ten years is also based on its determination that Trantino requires long-term intensive psychotherapy. In its decision of September 25, 1995, a two-member panel determined that parole must be deferred for an extended period because "long-term psychotherapy" was required in order for Trantino to reach his "rehabilitative potential."

The Parole Board appears to have considered long-term therapy as an alternative to or substitute for halfway house treatment. Both conditions appear to be predicated on a standard of "full rehabilitation." Thus, in imposing halfway house treatment as a parole condition, the Parole Board explained:

In New Jersey, the only present means to achieve this crucial goal [of reintegration into society] is through the placement by the Department of Corrections of Mr. Trantino in a halfway house while still an inmate.

The Parole Board firmly believes that this last and vital step must be attempted before Mr. Trantino could even be considered to be fully rehabilitated and granted

parole. Although we believe that it is not unreasonable to conclude that Mr. Trantino has made impressive strides in resolving his problems and internal conflicts that led to these homicides we will only have full knowledge of this man's rehabilitation through the reintegration process of a community based halfway house setting. In that context we can evaluate Trantino's readjustment to societal and not institutional stresses, to societal and not institutional failures, and to societal and not institutional temptations.

[296 *N.J.Super.* at 453, 687 *A.*2d 274 (quoting December 17, 1993 decision of Board).]

The Parole Board, in its final decision, in effect, linked the need for long-term therapy as a condition of parole to its earlier decision requiring halfway house treatment as a parole condition:

The Adult Panel is aware that a different Board Panel determined at your parole hearing on November 12, 1993 that you had reached your rehabilitative potential within the confines of prison and that your progress toward real and not superficial rehabilitation could only be maintained by placement in a halfway house as an inmate. You have attempted on numerous occasions to be placed in a halfway house as an inmate. The Department of Corrections has continually denied you placement into a halfway house. While this Adult Panel believes placement of you into a halfway house would be beneficial to you in your goal to reach your rehabilitative potential, it is this Panel's determination that certainly this is not the only means by which you can achieve this goal. It is this Panel's position that you can eventually reach this goal through long term psychological counseling in an institutional setting.

[*Id.* at 459, 687 *A.*2d 274 (quoting Board's September 25, 1995 notice of decision confirming its September 14, 1995 denial of parole).]

*See also id.* at 486, 687 *A.*2d 274 (Pressler, J., dissenting) (noting that because the DOC had refused to assign Trantino to a halfway house and because the Board "was of the view that defendant needs a period of intensive psychotherapy in lieu thereof, the Parole Board concluded that defendant should spend another ten years in incarceration to obtain that treatment"). Nevertheless, the Parole Board did not base its determination that Trantino needs long-term intensive psychotherapy on any express finding that such treatment was a functional equivalent of or an adequate substitute for halfway house treatment. Rather, the Parole Board determined that halfway house treatment was only "beneficial" and was not essential or "the only means" for Trantino to reach his "rehabilitative potential." Moreover, the Board appeared to shift the grounds for requiring long-term therapy, finding that

"until [Trantino] can remember specific events regarding the murder, including firing the gun that killed Sgt. Voto, [he] will not be able to fully accept [his] role in the crime and will not achieve [his] rehabilitative potential." *Id.* at 458, 687 *A.*2d 274 (quoting Parole Board's written decision of September 25, 1995); *see also id.* at 486, 687 *A.*2d 274 (Pressler, J., dissenting) (noting that the Parole Board doubted the "genuineness" of what it termed Trantino's "selective recollection" and concluded that his rehabilitation would not be complete until "he remembers the details of his appalling, terrible crime"). While it may be appropriate in other cases involving pre-Code inmates to insist upon evidence of subjective awareness of guilt before concluding that an inmate's avowal of responsibility is sincere and that he is rehabilitated to the point that he will not commit crimes if released, such an insistence may be unwarranted in this case where, we repeat, the record supports the finding that Trantino cannot and will not ever be able to remember actually pulling the trigger. The record thus does not clearly sustain the conclusion that long-term psychotherapy will eventuate in a breakthrough recollection or that such a recollection is necessary, given Trantino's repeated acceptance of responsibility, in order to ensure that he has achieved a level of rehabilitation that eliminates the likelihood that he will, if released, commit crimes. *See id.* at 472–74, 687 *A.*2d 274 (Pressler, J., dissenting) (finding evidence completely wanting in support of Parole Board's denial of parole and requirement of long-term therapy, even under the more difficult standard requiring "full and true rehabilitation").

■ We conclude that the Parole Board's decision that Trantino is not at present ready for parole and that he will not be eligible for parole for another ten years was influenced by the application of a standard of parole that may not have focused sufficiently on the likelihood that Trantino will commit crimes if released, but instead focused on the achievement of complete rehabilitation. Hence, the Parole Board's final determination cannot be said to be supported by adequate findings of fact derived from sufficient credible evidence. The current state of the record and the several

decisions of the Parole Board do not support and explain a determination that Trantino, if paroled, will likely again resort to crime. Accordingly, we set aside the Parole Board's decision denying parole and postponing reconsideration of parole eligibility for ten years.

IV

Because the basis for the Parole Board's determination of Trantino's current parole status is unclear and the decision may have resulted from application of an improper standard of parole, the matter must be remanded to the Parole Board to reconsider the basic issue of whether Trantino is now ready to be paroled. The Appellate Division's remand to the DOC to reconsider the availability of halfway house treatment is, therefore, premature and may, in fact, be unnecessary.

The Parole Board's ultimate determination of parole fitness must be based on whether there is a likelihood that Trantino will again engage in criminal activity. In evaluating Trantino's fitness for parole under this standard, the Parole Board should give weight to the facts that Trantino is now sixty years old and, as already noted, has previously been released on sixty-nine work details and two furloughs without incident; has not violated a correctional rule in twenty-seven years; has successfully completed substance abuse counseling; has educated himself while in prison; has pursued the available vocations for prisoners; has a stable support network; was housed without incident at the Wharton Tract, a facility without perimeter guards; and has been deemed fit for transfer by the last two psychologists to evaluate him. Moreover, in light of that evidence, the length of time Trantino has served under his sentence, and the successive occasions on which he has been deemed eligible for parole, punishment is no longer a material consideration in the parole determination.

In its determination, the Board can devise pre-release conditions that will allow it to assess how Trantino handles the stresses of society that may induce or impel him to commit crimes. Those

conditions could include community work details, furloughs, minimum security status, and other measures that would serve to reintroduce Trantino gradually into society and lead to his ultimate release. Alternatively, the Board may decide to impose post-release conditions, such as intensive supervision and drug testing, that would ensure that Trantino was not behaving in a way that indicates he will engage in criminal activity.

In its redetermination of parole fitness, the Parole Board may also consider halfway house treatment as a condition of parole. As the Appellate Division noted, the denial of placement in a halfway house was an inextricable part of the whole question of Trantino's parole status: "The 1994 denial of halfway house placement clearly impacts on the 1995 and 1996 decisions regarding parole, and the Parole Board decisions also impacted on the subsequent eligibility for halfway house placement." 296 *N.J.Super.* at 462, 687 *A.*2d 274. Glenn Ferguson, the evaluating psychologist, recognized halfway house treatment as a possible condition of parole. He stated: "A transitional setting prior to final release would most likely aid Thomas in making a problem free adjustment on parole after thirty-two years of incarceration, but is not viewed as crucial." We concur in Judge Stern's observations:

> [T]he record details the consistent position of the Board that it cannot prudently grant parole to a long term prisoner, convicted of a crime such as murder, before performance in a halfway house or residential facility can be thoroughly evaluated. And we cannot say that this policy is arbitrary or unreasonable.... [E]valuation of an inmate's conduct in such a setting is, in any event, valuable in assessing whether or not the inmate is ready for parole and the conditions to be attached.
>
> [*Id.* at 465, 687 *A.*2d 274.]

Because the final decision of the Parole Board in 1996 denying Trantino parole and fixing a future eligibility date at ten years was predicated on the DOC's earlier 1994 refusal to accept Trantino into a halfway house as a condition for parole, we must consider also whether the DOC's decision to refuse Trantino's transfer to a halfway house is valid. Based on the cogent reasons set forth in the opinions of Judges Stern and Pressler, we conclude that it was not, *viz:*

The DOC's decision not to transfer Trantino to a halfway house was never embodied in any final determination of the agency. Certainly the words "seen for community release" were not reasons, as the Board panel subsequently told Trantino. Nor can the letter from Riverfront Administrator Lewis to a DOC investigator suffice as the final administrative action or substitute for the necessary statement of the reasons for the decision. *See N.J.A.C.* 10A:20–4.10(d) [now renumbered –4.8(d) ]. The Commissioner is responsible for the final agency determination, and we cannot find in the record any reasons rendered by him or his office for the decision not to transfer Trantino.

However, *N.J.A.C.* 10A:20–4.12 [now recodified at *N.J.A.C.* 10A:20–4.10] places authority for such transfer decisions in the ICC. Thus, even if its determination is final on such matters, the decision (embodied in a memorandum filed in June 1995, almost one and one-half years after it was rendered) was based on letters not produced in the record and which we are told were "misplaced." The decision was also premised on the fact that Trantino's case had "high visibility and notoriety, through the news media and through Senator Kosco who vehemently objected to the parole and community release of inmate Trantino." These reasons embodied in an internal DOC memo, without a supporting record (or reconstruction) simply cannot be the basis for denying transfer when the Parole Board considered such placement critical to the parole process. *See N.J.A.C.* 10A:20–4.10(d) [now renumbered –4.8(d) ], –4.12(f) [now recodified at –4.10(c) ].

[*Id.* at 462–63, 687 A.2d 274 (internal citations omitted); *see id.* at 480–82, 687 A.2d 274 (Pressler, J., dissenting).]

In the event the Board considers and determines a transfer to a halfway house to be a necessary or reasonable condition for parole in order to engender the likelihood that Trantino will not engage in criminal activity, the DOC is directed to heed the Parole Board's request and consider whether Trantino should be placed in a halfway house. The DOC decision, in that event, must be based on sufficient credible evidence and its findings and reasoning adequately explained. As Judge Stern pointed out:

[R]egulations require a statement of reasons for the denial of halfway house placement, *N.J.A.C.* 10A:20–4.10(d) [now renumbered—4.8(d) ], and given the relation between this subject and the Parole Board's action for approximately six years, we conclude that reasons for the DOC action or inaction on the subject are required.

[*Id.* at 465, 687 A.2d 274 (internal citations omitted).]

Under current regulations, among the factors that the DOC can consider when evaluating an inmate's application for transfer to a halfway house are the objective classification scoring results; needs and interests expressed by the inmate; age; family status; social contacts with family and friends; correctional facility adjust-

ment; educational history and needs; vocational history and. needs; military history; nature and circumstance of present offense; prior offense record; records from previous confinement; detainers on file or pending; drug dependency and/or involvement; sexual adjustment; history of escape, attempted escape or propensity for escape; current psychological and/or psychiatric reports; medical history and recommendations; arson history; needs of the Correctional facility; and/or any other factor pertinent to the inmate's case. *N.J.A.C.* 10A:9:3–3(a)(1)—(21). The regulations also provide that an inmate "shall" have a psychological evaluation, not more than six months old, that addresses his "readiness and ability to adequately adapt to the pressures and responsibilities of living outside the correctional facility" and shall not be "likely to pose a threat to the safety of the community." *N.J.A.C.* 10A:20–4.4(a)(2), (3). In its remand to the DOC, the Appellate Division commented on the lattermost factor:

> If the decision [of the DOC] is premised, in whole or part, on concerns for the safety of Trantino or others, it must state reasons for the DOC's conclusions that the threats are real and why the safety of Trantino and others cannot be reasonably protected with available resources. The public may be reasonably outraged by Trantino's lawless conduct, but it cannot be presumed that those so outraged will resort to the type of conduct they find so offensive.
>
> [296 *N.J.Super.* at 464, 687 A.2d 274.]

The record does not support a finding that concerns of safety would be a basis for the denial of halfway house transfer.

Finally, it is expected that the DOC, in considering any request for halfway house treatment, will exercise its authority under the Interstate Corrections Compact, *N.J.S.A.* 30:7C–1 to –12; *N.J.A.C.* 10A:10–3.1 to –3.19, to secure such a placement, if that becomes necessary. Such a placement is possible given that the Interstate Corrections Compact envisions cooperation and flexibility among member states, *N.J.S.A.* 30:7C–2; New Jersey would retain ultimate control over Trantino's fate, *N.J.S.A.* 30:7C–5; and the DOC presumably has arranged transfers before in circumstances not unlike this one.

We conclude, as did the Appellate Division, that the DOC, if requested by the Parole Board, will correctly exercise its discretion on remand in accordance with the Court's opinion.

V

In view of Trantino's status as a Title 2A inmate, the standard governing his parole is not derived from current notions of punishment and sentencing. *See N.J.S.A.* 2C:43–7.2 (mandating that for violent crimes of the first or second degree the sentencing court must now impose a term of parole ineligibility equal to at least 85% of the term of the sentence); Stacey L. Pilato, *New Jersey's No Early Release Act,* 22 *Seton Hall Legis. J.* 357, 395 (1997) (describing recently enacted federal and state truth-in-sentencing acts that have reduced the possibility of parole). The criteria for the parole of Title 2C prisoners, which are influenced by current punishment and sentencing standards, simply may not be applied in this case. *Trantino Parole Application, supra,* 89 *N.J.* at 367, 446 *A.*2d 104.

In concluding that the Parole Board's decision must be set aside and the matter reconsidered, we must look primarily to the Parole Act of 1979, in which the Legislature adopted as the standard for parole fitness whether there is a substantial likelihood of future criminal activity if the prisoner is released. That standard for parole release is legislatively mandated, and it is the judiciary's obligation to adhere to express legislative enactments and to effectuate legislative intent. Our holding in no way diminishes or mitigates the heinousness of Trantino's 1963 offenses. Our prior opinion described in detail the vicious homicides that led to Trantino's convictions and lengthy imprisonment. *Trantino Parole Application, supra,* 89 *N.J.* at 352, 446 *A.*2d 104. The brutality of those crimes, whose victims were a Lodi police sergeant and a police trainee, unquestionably is seared not only in the memories of the victims' families and friends but also in the consciousness of society. From the standpoint of retribution, perhaps no prison sentence, whatever its length, is sufficiently

severe. Nevertheless, the punitive elements of retribution and general deterrence cannot, under the law, be the determinative factors in resolving this prisoner's eligibility for parole release. On remand, the Parole Board is obligated to apply the proper statutory standard.

That standard, as clarified in this opinion, requires that it be demonstrated that the inmate has attained a level of rehabilitation that can assure there is no likelihood that he or she will engage in criminal conduct if released on parole. In light of that standard, it is not clear that there was sufficient evidence and adequate findings of fact to support the denial of parole. Thus, the decision of the Parole Board in denying Trantino parole and fixing a future parole eligibility date at ten years is set aside.

Accordingly, we modify the remand to require that the Parole Board first consider Trantino's parole eligibility. In the event that the Parole Board determines that halfway house treatment shall be imposed as a condition for parole release, then the implementation of that condition shall be undertaken by the DOC in accordance with this opinion.

The judgment of the Appellate Division is modified and affirmed.

*For modification and affirmance*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.