752 A.2d 761 (2000)
331 N.J. Super. 577
Thomas TRANTINO, Appellant,
v.
NEW JERSEY STATE PAROLE BOARD, Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 20, 2000.
Decided June 9, 2000.
*763 Roger Lowenstein, for appellant.
Howard J. McCoach, Deputy Attorney General, for respondent (John J. Farmer, Jr., Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Mr. McCoach, on the brief).
Before Judges KING, WALLACE and FALL.
*762 The opinion of the court was delivered by FALL, J.A.D.
Appellant, Thomas Trantino, a New Jersey State prisoner, appeals from the June 9, 1999 final administrative decision of respondent, New Jersey State Parole Board (Board), denying him parole and from the November 10, 1999 decision of the Board establishing a future parole eligibility term (FET) of twenty years. These decisions were rendered by the Parole Board upon the Supreme Court's remand of the Board's prior denial of parole to Trantino. See Trantino v. New Jersey State Parole Bd., 154 N.J. 19, 711 A.2d 260 (1998) (Trantino II).
While conduct is often dictated by other factors, such as the application of moral convictions and beliefs, as a free society we are governed by constitutional standards and the laws enacted that are designed to *764 reflect those standards. Reasonable differences in the application and interpretation of those standards and laws are often manifested in the form of legal disputes that dictate resolution through court action. Fundamental to the fairness of our court system is our principle that the standards and laws by which we live are equally and fairly applied to all. Guided by that principle, we apply the standards and laws of our State to this appeal.
On August 23, 1964, Trantino was convicted of first-degree murder and sentenced to death. His conviction was affirmed on direct appeal. State v. Trantino, 44 N.J. 358, 209 A.2d 117 (1965), cert. denied, 382 U.S. 993, 86 S.Ct. 573, 15 L.Ed.2d 479 (1966), reh'g. denied, 383 U.S. 922, 86 S.Ct. 901, 15 L.Ed.2d 679 (1966). When our Supreme Court invalidated the statute under which the death penalty for first-degree murder was imposed, N.J.S.A. 2A:113-4 (repealed 1979), Trantino's death penalty was commuted to a single sentence of life imprisonment. State v. Funicello, 60 N.J. 60, 67-68, 286 A.2d 55 (1972), cert. denied, sub. nom., New Jersey v. Presha, 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972). Under the Supreme Court's mandate, Trantino was "sentenced to life imprisonment, nunc pro tunc, as of the date the death sentence was initially imposed, the defendant to be entitled to the same credits as if initially sentenced to life imprisonment." Id. at 67-68, 286 A.2d 55. As a result, "Trantino became eligible for parole in 1979," because a person sentenced to life imprisonment under N.J.S.A. 2A:113-4 was eligible for parole after twenty-five years less commutation time and work credits. In re Trantino Parole Application, 89 N.J. 347, 352, 446 A.2d 104 (1982).
The history of Trantino's record in prison and his efforts to achieve parole are detailed in our opinion in Trantino v. New Jersey State Parole Bd., 296 N.J.Super. 437, 442-59, 687 A.2d 274 (App.Div.1997), where we considered Trantino's appeal from the Parole Board's April 1996 decision denying him parole and fixing an FET of ten years thereafter. In a majority opinion delivered by Judge Stern, we affirmed the final administrative action of the Parole Board denying Trantino parole and establishing the FET date, and remanded to the Department of Corrections (DOC) "for consideration of an updated application by Trantino for halfway house (or out-of-State transfer) and for findings and a statement of reasons with regard to such application." Id. at 464, 687 A.2d 274. Judge Pressler issued a separate opinion, concurring with the remand to the DOC, but dissenting in part, stating:
I am satisfied that the record supports the administrative determination that a pre-release halfway house placement preparatory to Trantino's parole would be the optimum disposition. I believe that the [DOC] acted arbitrarily in denying that placement and, as I have indicated, I would order it to effect that placement now either in the State or as it had earlier planned, outside the State following a period of in-custody evaluation by another prison system. If the [DOC] were to do so on a timely basis, I believe that that action would effectively moot the Parole Board's subsequent actions. If it were not to do so on a timely basis, I would reverse the Parole Board's most recent denial of parole accompanied by the ten-year FET and direct it to fix conditions of parole that would most nearly approximate pre-release placement, including a post-release placement, intensive supervision, substance abuse counseling and psychotherapy and such other conditions as would permit the Parole Board cautiously to scrutinize Trantino's post-release adjustment and behavior.

[Id. at 489, 687 A.2d 274.]
Judge Humphreys filed a concurring opinion, expressing his "conviction that the Parole Board's decision to deny parole to Thomas Trantino was the correct decision, *765 correctly arrived at in accordance with law and due process." Id. at 490, 687 A.2d 274.
Trantino appealed, and the New Jersey Supreme Court granted certification. See 150 N.J. 24, 695 A.2d 667 (1997).
In an opinion by Justice Handler, the Court began by reviewing the evolution of the statutory standard for determining parole eligibility, concluding the standard governing Trantino's case is that stated in the Parole Act of 1979, "whether there is a substantial likelihood the inmate will commit a crime if released on parole." Trantino II, 154 N.J. at 31, 711 A.2d 260.
After examining the Parole Board's actions in Trantino's case since 1991, the Court observed the Board had concentrated not only on Trantino's recidivism prospects, but also on the extent to which he had become fully rehabilitated. Id. at 30-31, 711 A.2d 260. The Court noted "that the Parole Board considered that rehabilitation and recidivism were cognate criteria." Id. at 31, 711 A.2d 260. This was an improper premise, reasoned the Court, because rehabilitation is relevant "only as it bears on the likelihood that the inmate will not again resort to crime." Ibid. The Court explained the applicable standard, as follows:
In view of Trantino's status as a Title 2A inmate, the standard governing his parole is not derived from current notions of punishment and sentencing. See N.J.S.A. 2C:43-7.2 (mandating that for violent crimes of the first or second degree the sentencing court must now impose a term of parole ineligibility equal to at least 85% of the term of the sentence); Stacey L. Pilato, New Jersey's No Early Release Act, 22 Seton Hall Legis. J. 357, 395 (1997) (describing recently enacted federal and state truth-in-sentencing acts that have reduced the possibility of parole). The criteria for the parole of Title 2C prisoners, which are influenced by current punishment and sentencing standards, simply may not be applied in this case. Trantino Parole Application, supra, 89 N.J. at 367 [446 A.2d 104].
In concluding that the Parole Board's decision must be set aside and the matter reconsidered, we must look primarily to the Parole Act of 1979, in which the Legislature adopted as the standard for parole fitness whether there is a substantial likelihood of future criminal activity if the prisoner is released. That standard for parole release is legislatively mandated, and it is the judiciary's obligation to adhere to express legislative enactments and to effectuate legislative intent. Our holding in no way diminishes or mitigates the heinousness of Trantino's 1963 offenses.... From the standpoint of retribution, perhaps no prison sentence, whatever its length, is sufficiently severe. Nevertheless, the punitive elements of retribution and general deterrence cannot, under the law, be the determinative factors in resolving this prisoner's eligibility for parole release.
[Trantino II, 154 N.J. at 43-44, 711 A.2d 260.]
Because it was "not clear" whether the Parole Board used a "more exacting and difficult test" than was called for, the Court deemed it "equally unclear whether the Parole Board's findings of fact were adequately tailored to the correct test and whether the underlying evidence was sufficient to support a determination conforming to that test." Id. at 32, 711 A.2d 260. The Court proceeded to review the evidence before the Parole Board in support of its most recent denial of parole in May 1996. Id. at 32-38, 711 A.2d 260.
The Court found that the existing record "discloses substantial evidence of significant rehabilitation tending to demonstrate that Trantino has overcome any likelihood of recidivism[,]" namely, the absence of prison infractions since 1970, his successful work-releases and overnight furloughs, his participation in programs designed to enable him to help other inmates, his participation *766 in individual and group psychotherapy, the consistently favorable reports of his supervisors, and the reports of the two evaluating psychologists, Drs. Bell and Ferguson. Id. at 32-33, 711 A.2d 260.
The Court then addressed the Parole Board's main emphasis on Trantino's alleged memory loss about the details of the murders, which indicated, in the Board's view, Trantino's refusal to accept responsibility for his crime. Id. at 33-34, 711 A.2d 260. Citing to numerous references in past proceedings, the Court found "evidence in the record that Trantino's memory loss is consistent, long-standing and genuine, and, beyond the issue of recollection, his acknowledgment of responsibility is sincere and legitimate." Id. at 35, 711 A.2d 260. The Court noted that even the Board's two psychologists so found, and yet the Board failed to explain adequately its rejection of its experts' conclusions. Id. at 36, 711 A.2d 260.
In its April 1996 decision, the Parole Board had suggested that long-term psychotherapy might be necessary for Trantino to recover his memory of the details of the crime; it was for that reason that the Board had imposed a ten-year FET. But, in the light of the evidence that Trantino's memory loss was genuine and that he had nonetheless accepted blame for the crime, the Court ruled the record did not justify the ten-year FET or the mandate of longterm therapy. Id. at 37-38, 711 A.2d 260.
In setting aside the parole denial, the Court "remanded to the Parole Board to reconsider the basic issue of whether Trantino is now ready to be paroled." Id. at 39, 711 A.2d 260. On that remand, counseled the Court, "the Parole Board is obligated to apply the proper statutory standard." Id. at 44, 711 A.2d 260. The Court then purported to mold the shape of that remand. First, it listed the evidence in the existing record that tended to disprove the likelihood of recidivism, and it directed the Parole Board to "give weight" to that evidence. Id. at 39, 711 A.2d 260. In the light of that evidence, decreed the Court, "punishment is no longer a material consideration in the parole determination." Ibid.
Second, the Court reviewed the permissible conditions that the Board might choose to impose, including pre-release conditions such as work details, furloughs, and minimum security status, or post-release conditions, such as intensive supervision and drug testing. Id. at 40, 711 A.2d 260. The Court also noted the viability of placement in a halfway house and the DOC's unreasonable rejection of such a placement. Ibid. The Court ordered the DOC to consider such a placement if the Parole Board, after the remand, chose to request it, and required the DOC issue a statement of reasons for its decision either way. Id. at 40-41, 711 A.2d 260. The Court listed the pertinent factors, derived from the governing regulation, that the DOC must consider. Id. at 41-42, 711 A.2d 260. The Court also added its own observation that "[t]he record does not support a finding that concerns of safety would be a basis for the denial of halfway house transfer." Id. at 42, 711 A.2d 260.
With this procedural background and the focus of the Court's decision in Trantino II, we now review the actions and decisions of the Board and the DOC on the remand mandate.
After the Court's decision in Trantino II, Trantino applied to the DOC for transfer to a halfway house. That application was approved, and on August 18, 1998, Trantino was transferred from Riverfront State Prison to Talbot Hall in Kearny, New Jersey for evaluation and assessment. Following months of evaluation and program participation, a Classification Committee hearing was held and a determination was made that a halfway house was an inappropriate custody assignment for Trantino, and he was transferred to South Woods State Prison.[1]
*767 In its June 9, 1999 final decision, the Parole Board explained to Trantino how it had interpreted the Supreme Court's remand instructions in Trantino II, as follows:
Subsequent to the Supreme Court's decision, the Parole Board determined that the only way to reasonably comply with the standard the Court had set forth was to engage in a comprehensive review of your case. The Parole Board is of the opinion that to review your record only through to the time of your last parole hearing, just over three years ago, would have resulted in an incomplete and inadequate assessment of whether it is likely or not you would commit a crime if released on parole. Therefore, the Parole Board engaged in a process of updating and reviewing an extensive amount of information regarding who you were in the past, and who you are now, with the intent of assessing who you are likely to be in the future.
The Board added it had attempted "to obtain information previously not available to the Parole Board that would shed light on the person you were prior to August, 1963 when you brutally murdered one police officer and a provisional police officer in a bar in Lodi, New Jersey."
The remand process began in July 1998, when Trantino was interviewed by the Board's hearing officer, Efrain Feliciano, who then referred the matter to the Board. In September 1998, the Attorney General filed a letter with the Board opposing parole and requesting an "informational hearing." Trantino's counsel filed a letter objecting to any "new information," urging that the Court's remand allowed consideration of the existing record only. The Board granted the Attorney General's request.
The Attorney General retained a psychologist, Dr. Eilers, to examine Trantino; he did so in November 1998. Before Dr. Eilers submitted his report, the Attorney General, in December 1998, withdrew his request for an informational hearing, though he continued to oppose parole based on the report of Dr. Welner[2] and psychological testing from September 1998.
The Board permitted Trantino to submit the report of his own psychologist, Dr. Rosenfeld. Trantino requested the Board grant Dr. Rosenfeld access to all documents that Dr. Eilers had reviewed. Citing the Attorney General's withdrawal of his request for an informational hearing, the Board denied Trantino's request.
Trantino filed an application with us for leave to appeal from the Board's "denying appellant access to certain materials and denying an informational hearing and the right to present expert testimony." By order entered on February 4, 1999, we directed the Board to provide Trantino with copies of all tests, evaluations, and other documents considered by the Board and its experts, subject to our in camera review of any documents claimed by the Board to be confidential. We denied Trantino's application for leave to appeal with respect to the denial of an informational hearing and from denial of Trantino's request to present live expert testimony before the Board.
In compliance with the order, the Board submitted to us numerous documents it claimed were confidential. By order of March 4, 1999, we ordered the Board to turn over all but one of the documents (an "Internal Memorandum") to Trantino's counsel, but directed that the released documents not be shown to Trantino himself.
*768 The Parole Board adduced the following evidence during its hearings.
On February 3, 1999, the Board conducted a telephonic interview with Joseph Trabucco, Director of Assessment and Education at Talbot Hall, a facility where inmates were given psychological tests. Trabucco's qualifications included a master's degree in psychology. In September 1998, Trabucco administered to Trantino a 175-question true-false standard psychological test known as the MCMI-III. The report itself indicated the results should not be considered definitive or in isolation, and that it "should be evaluated in conjunction with additional clinical and biographical information."
In his interview with Parole Board Chairman Consovoy, Trabucco described an incident during the testing that he deemed significant in assessing the risk of release. Trabucco stated he tested Trantino on the issue of substance abuse within the year prior to September 1998, which testing disclosed Trantino had no substance abuse problem. Trabucco stated that when he asked Trantino, in September 1998, to again answer the substance abuse questions on the basis of his whole lifetime, Trantino became "sort of agitated," not acting violently but "definitely perturbed." Trabucco noted Trantino's "veneer ... started to ... crack a little bit." According to Trabucco, Trantino responded in the following manner:
His face was kind of red, he was slightly more animated and agitated. And he said, You know, I know it's not you, Mr. Trabucco, but, you know, those guys at corrections, they're out to get me. And he went into this kind of spiel about how it wasn't me that was making him take this test, but other people, and they were going to take the results and do what they wanted to do anyway. And we got him to sit down again, and then he got up the third time and was then agitated enough, now again, I didn't feel threatened, I didn't feel, you know, that he was going to hit me or anything, but heit was the only time in this whole experience here when Iwhen I sensed that that veneer had cracked to some extent. He was highly animated and agitated, took his glasses off, was sort of pacing, was a very different Mr. Trantino then [sic] I think most people get to see. Andand well, he didn't takethe outcome was we didn'twe couldn't get him to sit down and take the other part of the test, and I'm not sure it mattered much in the long run anyway.
But as I look back and look at the results of the testing and his experience here, I mean I think whatwhat it indicated to me was, that whenwhen you put him in a situation, when you press him, or put him in a situation he doesn't feel in control or totally comfortable with, you beginyou begin to see this other side ofof this person, which, you know, the cool calculated responses tend to vanish, and the agitation sets in.
From that reaction, together with some of the test responses, Trabucco surmised Trantino had learned over time to give the prison authorities what they wantedcreating a kind of "facade"but when pressured or denied control over a situation, the "real" person began to emerge. Based on that incident, Trabucco opined that, "given the right stresses," Trantino could resort to violence. He concurred with Consovoy's observation that there was "some" risk of recidivism.
Trabucco reported to the Board that the results from the MCMI-III test revealed Trantino to be manipulative and deceptive, with a deficient social conscience. With regard to potential for violence, the report concluded: "Although violence is not a major characteristic of this inmate's behavioral repertoire, there may be occasions when violence can be provoked, although not readily."
An Assessment Report of the testing was prepared by Cynthia Smarook, an assessment counselor at Talbot Hall. Smarook noted the test results indicated a low *769 potential risk for recidivism, but Trantino's potential for committing a future violent act was greater than 60% to 70% of other inmates. During his thirty-day stay at Talbot Hall, Smarook stated Trantino earned an above average rating for his behavior, acting respectfully toward staff and offering support to his peers. Smarook summarized her findings as follows:
It is clear that Mr. Trantino has adjusted well to prison life and has adapted to the structured setting of a prison. The question is how much of this change is superficial and how much has to do with a genuine change in beliefs and attitudes that would result in a positive outcome in the less structured setting of a halfway house. Mr. Trantino's test results raise some serious concerns as to his ability to make this transition. His testing indicated that he often acts in a devious and manipulative manner and is inclined to deduce [sic] others into his schemes and plots and that he attempts to evade responsibility through manipulation and deception. The testing also indicated he is a very high risk for escape.
Although testing can at time[s] be suspect and the individual must be viewed in a holistic manner, it is obvious that at this time there are serious questions as to Mr. Trantino's ability to function successfully in a less structured setting. Based on the above concerns, we feel the classification committee should consider having Mr. Trantino remain in a more secured setting rather than a community corrections placement.
Smarook was present during the September 1998 MCMI-III testing, and she confirmed Trabucco's characterization that Trantino had shown some agitation.
Dr. Ferguson, the Parole Board's chief psychologist, was interviewed by Chairman Consovoy on June 2, 1999. Dr. Ferguson examined Trantino in August 1998 and submitted a report of his findings. Dr. Ferguson had also evaluated Trantino in August 1995, before the Board's 1996 denial of parole.
In his August 1995 report, Dr. Ferguson had observed it was "quite conceivable that Thomas was experiencing a drug induced psychotic state when he committed the offense," which could explain how he was able to commit a brutal crime "so contrary to his moral character." On a test designed to measure likely success on parole, Trantino scored 62%; a score of 35% or lower indicated probable failure on parole, and a score of 65% or higher indicated probable success. In August 1995, Dr. Ferguson concluded Trantino should be released on parole, stating:
Presently, Thomas functions more as a staff member in the prison than as an inmate. He has developed a well rounded and reputable support network which should enable Thomas to manage the increased stress level of independent living optimally. He has a high level of motivation for continued education, therapy and employment. His employment plans appear realistic and attainable, including technical work with his wife's copyrighting [sic] company and creative work in art and therapy.
A transitional setting prior to final release would most likely aid Thomas in making a problem free adjustment on parole after thirty-two years of incarceration, but is not viewed as crucial. The combination of well established social supports, motivation for ongoing treatment, and age will most likely lead to a successful parole outcome. Psychotherapy at this point should focus on issues of conflict resolution, anxiety, and possible emerging depression. Any weakening in the support network or evidence of relapse into substance abuse could lead to disastrous results.
Dr. Ferguson's August 1998 report noted psychological testing had revealed Trantino's anti-social traits, although he was less antisocial than most other inmates; these traits were "not of a magnitude to suggest that Thomas is an imminent *770 risk for parole violation, or violent recidivism if released." Dr. Ferguson noted that while Trantino continued to deny remembering the specifics of the murders, he had accepted responsibility for them. Dr. Ferguson concluded, as follows:
If Thomas can successfully negotiate the difficulties inherent in community halfway house placement for one year, it would seem reasonable to believe that community living on parole would meet with similar success. Special care should be given to ensuring his sobriety through frequent unannounced urine monitoring and continued AA participation. Mental health counseling should also be a condition of parole with an emphasis on developing and maintaining positive coping strategies.
In its decision to deny parole, the Board "relied heavily" on Dr. Ferguson's interviews with it on June 2 and 9, 1999. On June 2, Dr. Ferguson stated Trantino evidenced several characteristics of a "borderline" personality, which he defined as reflecting a "pervasive pattern of instability, interpersonal relationships, self-image and affect and marked impulsivity beginning by early adulthood, and present [sic] by a variety of conflicts." The borderline traits Dr. Ferguson noted as displayed by Trantino were: (1) unstable interpersonal relationships; (2) unstable self-image; (3) impulsiveness; (4) moodiness; (5) chronic feelings of emptiness; (6) difficulty in controlling anger; and (7) paranoia.
In Dr. Ferguson's view, the combination of narcissism and his borderline personality made Trantino potentially explosive and violent. He explained:
Mr. Trantino [is] a particularly dangerous individual ... [b]ecause of his unpredictability and his unwillingness to clearly examine potential problems in the future. That, you know, makes it almost impossible for him to avoid situations where he is going to be faced with blows to his ego, blows to his narcissism that are going to trigger feelings of, you know, emptiness, and loneliness, and unworthiness, and, you know, wanting to fill those.
If he's in a community setting where he doesn't have a lot [of] external controls, you know, strict supervision, you know, serious consequences for behaviors, and there's a liquor store or bar on the corner, you know, it's going to take an awful lot of effort on his part to not to walk into that bar and sit down and start drinking.
And once that hurdle's crossed, you know, the next guy that walks in and recognizes him and says, "Oh, that's that cop killer." And, you know, "What the hell are you doing here?" And, you know, gets in his face and starts pointing his finger and pushing his buttons, I don't think it takes that big of a leap to say that there is a potential for violence.
Dr. Ferguson felt Trantino could not avoid his personality problems until he accepted they existed. Dr. Ferguson noted that while Trantino did admit his narcissism, he did not acknowledge his other negative traits.
Dr. Ferguson reviewed with the Board the report of Trantino's psychologist, Dr. Rosenfeld, and concluded it should be discounted. Dr. Ferguson stated that since Dr. Rosenfeld had been hired by Trantino, the report was "somewhat slanted in the direction of being favorable to Mr. Trantino." Dr. Ferguson noted that Dr. Rosenfeld admitted his assessment was based on material supplied by Trantino's attorney. Dr. Ferguson also stated Dr. Rosenfeld did not seek out objective data on his own, gave insufficient weight to his own negative findings, and scored one of the psychological tests incorrectly.
Acknowledging his current assessment had changed since his report in 1995, Dr. Ferguson attributed his revised view to his own inexperience in 1995 and to the greater amount of information available to him during his 1998 evaluation. In addition, Dr. Ferguson stated Trantino had a better "support system" in place in 1995, in that *771 he was still married, he was to be released to a halfway house in Camden, and he had a job prospect working as a free-lance copywriter for his wife's firm. Dr. Ferguson noted that since 1995, however, Trantino and his wife divorced, thereby causing "a major setback in terms of his support system." A strong support system, Dr. Ferguson averred, "definitely weighs heavily in terms of the outcomes and prognosis for future adjustment."
Dr. Ferguson was also interviewed by the Board on June 9, 1999, after he heard Trantino's testimony before the Board. Dr. Ferguson stated his opinion had not changed, and that Trantino's testimony confirmed his assessment of his unfitness for parole. Dr. Ferguson cited Trantino's desire to write another book about the crime as evincing his narcissism and lack of empathy for the families of the victims. He again emphasized Trantino's lack of self-awareness and the deterioration of his support system. Dr. Ferguson agreed with Chairman Consovoy's characterization that "in judging risk [Trantino] hasn't made much progress" in the thirty-five years since the crime.
Trantino submitted evidence and testified before the Parole Board. Dr. Rosenfeld submitted two reports on Trantino's behalf and appeared for an interview with two Parole Board members. In his initial twenty-four-page report, Dr. Rosenfeld extensively reviewed Trantino's history and present psychological condition, concluding Trantino did not currently "suffer from any major mental disorder or personality disorder." Dr. Rosenfeld noted that while Trantino demonstrated an anti-social personality disorder before his incarceration, he had engaged in "pro-social endeavors for the past several decades," leading Dr. Rosenfeld to conclude Trantino "has clearly resolved most of the symptoms and behavioral problems that led him to a life of crime and violence." Dr. Rosenfeld conceded Trantino's "grandiosity, a need for attention, and limited empathy," but deemed those traits to be "consistent with a narcissistic personality disorder [rather] than an antisocial personality disorder."
Dr. Rosenfeld observed Trantino had adopted "far more adaptive methods" of expressing his past problems with authority and need for attention, such as engaging in non-violent protests in prison and expressing himself in his writing.
Dr. Rosenfeld found Trantino's claimed loss of memory about the details of the crime consistent with Trantino's claimed alcohol and drug-induced blackout, and with the research on repressed memory. Moreover, Dr. Rosenfeld noted Trantino had acknowledged responsibility for the crime; hence, to demand he also remember actually firing the gun would have negligible bearing on the risk of recidivism. Dr. Rosenfeld stated he concurred with the Supreme Court's comment that the record
does not clearly sustain the conclusion that long-term psychotherapy will eventuate in a breakthrough recollection or that such a recollection is necessary, given Trantino's repeated acceptance of responsibility, in order to ensure that he has achieved a level of rehabilitation that eliminates the likelihood that he will, if released, commit crimes.
[See Trantino II, 154 N.J. at 38, 711 A.2d 260.]
Dr. Rosenfeld acknowledged Trantino's negative risk predictors, including his criminal record, past substance abuse, and past attitudes toward authority. Dr. Rosenfeld concluded these factors were mitigated or outweighed by the positive predictors, including long-time abstinence from drugs or alcohol, good conduct on work assignments, insight into the causes of his criminal behavior, lack of violent or anti-social behavior in prison, and "the absence of any overt psychiatric symptoms."
"Perhaps the most important predictor" of the low likelihood of Trantino's recidivism, Dr. Rosenfeld wrote, was that he scored relatively low on the Psychopathy Checklist, a survey designed to detect *772 the characteristics of a psychopath. Dr. Rosenfeld found Trantino's low score was "a strong positive indicator of successful adjustment to parole."
Dr. Rosenfeld stated the risk of recidivism would be lessened by parole conditions designed to ease Trantino's transition into the real world, including placement in a halfway house, life-skills training, outpatient psychotherapy, and outpatient substance abuse treatment, such as attendance at Alcoholics Anonymous (AA) meetings.
In a supplemental report presented to the Board, Dr. Rosenfeld criticized, among other reports, Cynthia Smarook's assessment of Trantino's Talbot Hall testing of September 1998. Dr. Rosenfeld found Smarook's testing was developed on the basis of too-small a pool of parolees to have any predictive effect, rendering the test "virtually meaningless."
Dr. Rosenfeld also refuted many of Trabucco's findings concerning the Talbot Hall incident. Rosenfeld noted that, far from evidencing lack of control, Trantino's agitation at Trabucco's "seemingly inappropriate attempt to generate pejorative psychological test data" was a moderate and appropriate response. Further, Dr. Rosenfeld stated Trabucco, (1) discounted Trantino's good behavior record, (2) incorrectly stated Trantino had no remorse for his crime, and (3) applied a standard of "some risk" instead of the proper standard of "significant" risk of repeat offenses.
Trantino appeared before a two-member panel of the Board on June 4, 1999, and before the full Parole Board on June 9, 1999.
When asked to describe his parole plan, Trantino explained it was now "up in the air" because of his second wife Charlee's divorce from him in 1997. Trantino explained she divorced him out of despair over his continued incarceration, the media attention, and fear of the public's reaction if he were released. However, Trantino stated Charlee remained willing to let him work for her in Pennsylvania when he is released. Except for the complicating factor of his divorce and uncertainty over whether the Pennsylvania authorities would cooperate, Trantino stated his plan was the same as before"to live in Camden, get an apartment, say, in Cherry Hill. I would be working for my wife, my wife had a business, I would be going to Rutgers, I would be getting counseling, be going to AA meetings." Trantino claimed to have a "definite support system" in place, consisting of Charlee, his attorney, his AA sponsor, his sister, and his brother-in-law, a retired policeman. Trantino stated he also might be able to work in a bookstore or "learn to be a paralegal." He added, "I know I could get a job in one day, and have many people who could assist me with that." Trantino also stated he would read, write, and paint.
Trantino accepted full responsibility for the murders, testifying he knew he was the one who shot the officers although he could not remember the details. Trantino explained his earlier denials as "defense mechanisms," which he ultimately rid himself of through counseling. Trantino stated he was "ashamed" of what he had done, calling it a "sin." He summarized his feelings about his crime as follows:
Many people may have suffered far more than I'll ever suffer as a result of my actions, and II truly am sorry for anyany of the crimes that I committed, and any that I may have.... [T]he most serious thing of all, the killing of two human beings, shooting Mr. Dorney (phonetic) and Mr. Tedesco, and I wish the families will forgive me, and it breaks my heart that I can't be forgiven, because it's something I need as a human being. But I understand their their grief and their feelings towards me, but I try to do good. I don't only try, I do good, and I want to always be good, and I've done that for my entire incarceration.
At the June 4, 1999 hearing, Trantino was questioned about the Talbot Hall incident, *773 in which Trantino allegedly had become agitated when Trabucco sought to expand the substance-abuse questions beyond the previous six months. Trantino denied any such response on his part, adding that he got along well with everyone at Talbot Hall. Trantino also stated he had never seen the Talbot Hall "report."
Apparently, the report was given to Trantino before the June 9, 1999 hearing. After reading the report, Trantino explained he had denied knowledge of the incident at the June 4, 1999 hearing because Chairman Consovoy had not mentioned that Trabucco was the one involved. Trantino recounted his version of the incident:
I know the incident now, there was a woman psychologist, she went to give me a test, and I am saying this is not appropriate, and it was in this computer room. Other people were there, including Dr. Trabucco was in the back, and I just turned to him, I said, Doctor, could you help out over here. And he said what's the problem? I stated the problem and he told her that this man is in remission, he does not have to take that test, that's what he said, not whatever is said there actually, that's not what happened.
Now I might have been perturbed, certainly I was perturbed, but not angry, I was able to talk to him and he straightened it out. He said I didn't have to take it, that I am right. The man is in remission, he took the other test, all these other tests, he is okay, throw that away. That is what he said to that woman.
Trantino denied he ever "minimized" his 1963 abuse of his first wife, as Dr. Rosenfeld had reported. Trantino admitted he had hit or beaten her, for which he was now remorseful and which he had explored during many years of counseling. Trantino stated he was also "ashamed" of having once thrown a steak at her.
With respect to his alleged personality disorders, Trantino acknowledged his past narcissism but felt, through years of counseling and constructive behavior in prison, he had become more self-aware and sensitive to the needs of others. Trantino stated he knew he was not a threat to anyone; nor did he feel threatened by others, and by prayer and meditation he had learned to cope with external stresses. Trantino testified he had talked with counselors "all the time" about his former feelings of inadequacy and blaming of others. Trantino pointed out that, while the psychological testing may have revealed some personality disorders, his actual behavior over many years had not reflected any anti-social orientation. Trantino stated he was a firm believer in "cognitive therapy," pointing out that in his thirty-five years of incarceration, with all its attendant "stressors," he had never used drugs or alcohol and had never committed a violent act.
Interpreting its mandate on remand as being to examine Trantino's entire life, not merely his life since his last parole hearing, the Board analyzed Trantino's personal and criminal history from his birth in 1938 to his 1964 murder conviction, and from his incarceration through 1980.
In its June 9, 1999 decision, the Board observed that its latest review had "been the most extensive in the history of the Parole Board," which effort was
warranted based on the heinous nature of [Trantino's] underlying criminal offense, [his] many years of incarceration, [his] clear attempts to minimize the likelihood of future criminal behavior, directions by the State Supreme Court in the last ruling in [his] case, and in all candor the conflicting accounts of reviewing psychologists over the last thirty five years regarding [his] actual progress in reducing the likelihood of future recidivism.
As a result of that review, the Board unanimously concluded that it was "substantially likely [Trantino] would commit a crime if released on parole at this time and that the presumptive future parole eligibility *774 term is clearly inappropriate," requiring that the matter be referred "for consideration of a future parole eligibility term outside of administrative code guidelines."
The Board classified its reasons for denial of parole into the following four areas:
(1) Trantino's psychological profile;
(2) His inadequate parole plan;
(3) His failure to address the factors causing his abuse of his first wife; and
(4) His lack of candor regarding his loss of memory about the murders and other events.
We outline and discuss the Board's reasons for denial of parole to Trantino with reference to these four areas:
1. Trantino's psychological profile.
The Board "relied heavily" on Dr. Ferguson's testimony of June 2 and 9, 1999, stating, "Dr. Ferguson's testimony leads the Board Members to conclude that it is likely you would commit a crime if released on parole." The Board emphasized Dr. Ferguson's concern with the potentially volatile combination of Trantino's narcissism and his borderline personality traits.
The Board incorporated, by reference, a Confidential Memorandum appended to its decision but not disclosed to Trantino, as disclosure might "negatively impact" on Trantino's "future rehabilitation." In that Memorandum, after reviewing Dr. Ferguson's testimony at both hearings, the Board found Dr. Ferguson's opinion established that Trantino's narcissism and borderline personality created "a strong possibility of future violent behavior." The Board also accepted Dr. Ferguson's critique of the contrary opinion of Dr. Rosenfeld, to which the Board gave "no weight."
2. Inadequate parole plan.
At the June 9, 1999 hearing, Trantino stated his previous parole planto work with his wife's company in Camden, to attend Rutgers, and to obtain counseling was "up in the air" as a result of his 1997 divorce from her. The Board was "very concerned" by this uncertainty, explaining:
First, it is not the responsibility of the Parole Board to insure that an inmate has available to him or her, a parole plan that will reduce the likelihood of future criminal behavior. Therefore, it is not the responsibility of the Parole Board to insure that your parole plan is suitable to reduce the likelihood of future criminal behavior. The Parole Board can only evaluate the parole plan submitted by the inmate in the context of the Parole Board's legal standards in assessing parole suitability. In your case your parole plan raises serious concerns in terms of likelihood of future recidivism if you are released on parole.
Second, in contrast to your past several parole hearings, you are now divorced from your wife Charlee, who in the past was a central part of your support system if paroled. You attempted to explain your current relationship with Charlee, and in all candor your explanation of your current relationship with Charlee did nothing to assuage the Board's concerns regarding your parole plan.
3. Past spousal abuse.
The Board noted that during his years of incarceration, Trantino failed to address, through psychological counseling, the causes of his physical and verbal abuse of his first wife in 1963, prior to the murders. As an example of his lack of insight into this abuse, the Board quoted a portion of Trantino's June 9, 1999 testimony before the Board, in which he was unable to explain the term "cycle of violence" to the Board's satisfaction. The Board reasoned:
In the opinion of the Board Members your lack of counseling in the area of domestic violence is disturbing. Records indicate in the months prior to your present criminal offense you engaged in domestic abuse, both physically and in *775 the manner you described at your hearing. The abuse was so severe that your first wife moved out of your apartment in the weeks preceding the murder. Yet, in all your years of incarceration and counseling, you have never seriously explored this issue. In fact, as Dr. Rosenfeld notes, you have mitigated your abuse towards your first wife. Without exploring this issue in psychological counseling and the causes of the aforementioned abuse towards your first wife, the Parole Board is of the opinion it is substantially likely you would commit a crime if released on parole.
4. Lack of candor and insight regarding past conduct.
The Board listed seven "examples of when [Trantino has] been less than candid with authorities or psychologists or [has mitigated] central events on [his] life or aspects of [his] personality." The Board concluded this lack of candor "simply cannot be attributed to [his] inability to remember events that took place sometime ago."
First, the Board was impressed with Trabucco's testimony that Trantino became agitated and upset during the psychological testing at Talbot Hall in September 1998. The Board noted that at the June 4, 1999 hearing, Trantino denied this event ever occurred, whereas at the June 9, 1999 hearing, he admitted something happened, but denied it happened in the manner described by Trabucco.
Second, the Board reviewed Trantino's evolving acceptance of responsibility for the murders, ranging from outright denial in 1964 to total admission in June 1999. This history, in the Board's view, evidenced a "pattern of deception." The Board disagreed with the Supreme Court's conclusion that Trantino's claimed memory loss as to the details of the murders was "consistent, long-standing, and genuine." See Trantino II, 154 N.J. at 35, 711 A.2d 260. The Board explained, as follows:
With all due respect to the State Supreme Court, the Parole Board, based on a review of your entire record, does not find your claims of past memory loss as consistent or genuine. The issue at this time for the Parole Board is not whether you have made a sincere avowal of responsibility for commission of these offenses. In the opinion of the Parole Board ... you have sincerely claimed responsibility. The issue is rather, in the opinion of the Parole Board, that you have not been candid in the past with psychologists or Board Members regarding your memory of that night and this lack of candidness on a central issue to you is part of an ongoing pattern of deception you have exhibited with authorities.
Third, the Board cited Trantino's violations of his New York parole before the New Jersey murders.
Fourth, the Board criticized Trantino's testimony at the June 9, 1999 hearing, in which he "mitigated the extent of violence" involved in the 1956 New York robbery that led to his first incarceration. The Board noted Trantino characterized his conduct as a "snatching" of an envelope, whereas in fact the victim sustained a black eye and bruises.
Fifth, the Board commented on Trantino's 1963 abuse of his first wife, as follows:
Records from New York indicate the extent of abuse your first wife suffered in the months prior to the murders in Lodi. When questioned about your relationship with your first wife by Dr. Rosenfeld, you claimed you assaulted your wife on two occasions but you stated it wasn't a beating and you didn't think she would call you abusive. Dr. Rosenfeld noted in his report that you appeared to be minimizing the extent of violence towards your wife. It is the Parole Board's opinion that you have not been fully candid with authorities about your domestic violence to your first wife and have mitigated the extent of violence you showed towards her.
*776 Sixth, the Board discussed Trantino's apparent lack of candor regarding his 1974 efforts to resolve pending New York parole charges. The Board concluded Trantino was not forthright at the June 9, 1999 hearing when he advised the Board he was unaware that his New York attorney had attempted to have the New York parole detainer removed in 1974, despite the fact that a letter in the record dated August 30, 1974 from attorney Sanford Katz to New York parole authorities indicated he did in fact retain Mr. Katz to represent him in that matter.
Seventh, the Board noted Trantino advised Dr. Rosenfeld he had been steadily employed between ages seven and fourteen, but "Kings County Probation Reports indicate otherwise."
The Board acknowledged there were several factors in Trantino's favor, citing his "extensive program participation," including AA; the lack of any institutional infractions "in some time;" his counseling of other inmates; and in general his "great strides in improving ... as an individual."
However, the Board accorded great significance to Trantino's comments at the June 9, 1999 hearing about his plans to write a second book, which the Board saw as evidence of lack of empathy for the victims' families.
Trantino filed a timely notice of appeal from the June 9, 1999 decision denying him parole. As directed in its June 9 decision, the Board conducted a further inquiry into an appropriate FET date for Trantino. On November 10, 1999, the Board issued a decision imposing a twentyyear FET.
On appeal, Trantino presents the following arguments for our consideration:
A. THE PAROLE BOARD VIOLATED THE SPECIFIC TERMS OF THE SUPREME COURT'S REMAND.
B. THE PAROLE BOARD IS BOUND BY ITS PREVIOUS DECISIONS TO RELEASE APPELLANT TO THE COMMUNITY.
C. EVEN WITHOUT CONSIDERATION OF THE LANGUAGE OF THE REMAND, THE 1979 PAROLE ACT BARS CONSIDERATION OF ANYTHING OTHER THAN "NEW INFORMATION;" THE MATERIALS CONSIDERED BY THE BOARD WERE NOT STATUTORY "NEW INFORMATION."
1. Statutory "New Information" means Infractions.
2. The Board's Attempt to Characterize Its Findings as Based on New Information is Disingenuous.
D. THE REMAINING REASONS FOR PAROLE DENIAL ARE EQUALLY DISINGENUOUS.
1. The Trabucco Incident.
2. Appellant's Parole Plan is Suitable Enough for Release.
3. Appellant's Parole Denial for Expressing the Desire to Write a Book is a Blatant First Amendment Violation.
4. Appellant has Consistently Described his Prior Felony Conviction as a Violent Act.
5. Because Appellant was Drunk and High on Dexedrine on the Night of the Crime, His Memory of the Events is Less than Perfect; This has no Bearing on his Suitability for Parole.
6. Yes, Appellant Violated the Terms of his New York Parole.
7. The Details of Appellant's Attorney's Efforts to Remove the New York Parole Warrant were not Shared with Appellant.
8. Appellant's Childhood Employment.
9. Glenn Ferguson's Change of Heart is Insufficient to Warrant Parole Denial.
*777 E. THIS CASE IS A FORTIORI PAROLE BOARD v. CESTARI.
1. Appellant's Hearing was Intentionally Out of Time.
2. By Limiting its Psychological Input to its own Employees, the Board Committed Procedural Error.
a. The Assault on Dr. Rosenfeld's Professionalism.
b. The Board Ignored Those Psycologists Who Know Appellant Best.
3. The Board Consistently Heard and Considered Materials Outside the Record.
a. The Adult Panel Hearing.
b. The Full Board Hearing.
c. The "Confidential" Section of the Full Board Hearing.
d. The FET Hearing.
4. As in Cestari, There is an Inadequate Basis for Parole Denial.
F. TRANTINO, THE CONSTITUTION, AND THE GREAT WRIT OF HABEAS CORPUS.
1. The Ex Post Facto Clause Requires Reversal.
2. The 1979 Act's "Preponderance" Standard was Insufficient to Protect Appellant's Rights.
3. Appellant's Continued Imprisonment is Cruel and Unusual.
4. Appellant is Entitled to Habeas Corpus.
We have organized and categorized the pertinent issues in this appeal as involving, (1) the applicable parole eligibility standard, (2) whether the Parole Board improperly exceeded the scope of the Supreme Court's remand, (3) whether the findings and conclusions of the Parole Board are supported by substantial credible evidence in the record, and (4) the claims of procedural breaches and constitutional violations. We consider these issues in that order.

I
Defendant was convicted in 1964, when Title 2A was in effect. Unlike Title 2C, Title 2A did not include parole disqualifications as a sentencing element. Thus, whereas inmates eligible for parole under Title 2C are presumed to have satisfied the punitive goals of their sentences, no such presumption attaches to Title 2A inmates. As a result, the standards of parole eligibility are different for Title 2A and 2C prisoners, as explained by the Court:
Because a sentence of imprisonment imposed under Title 2C incorporates parole disqualification as a sentencing element, inmates serving such sentences "will have presumptively satisfied all punitive aspects of their sentences at the time they become eligible for parole." In contradistinction, prison terms imposed under Title 2A did not expressly include parole disqualification, and consequently, "the punitive aspects of [the] sentences [of Title 2A inmates] will not necessarily have been fulfilled by the time parole eligibility has occurred." For that reason, the determination of parole of a 2A inmate must take into account the punitive aspects of the sentence.
[Trantino II, 154 N.J. at 25-26, 711 A.2d 260 (quoting In re Trantino Parole Application, 89 N.J. 347, 370, 446 A.2d 104 (1982)).]
This pre-Code standard was reflected in the Parole Act of 1948, which predicated parole eligibility on a finding " `that there is a reasonable probability that, if such prisoner is released, he will assume his proper and rightful place in society, without violation of the law, and that his release is not incompatible with the welfare of society.'" Trantino II, 154 N.J. at 26, 711 A.2d 260 (quoting N.J.S.A. 30:4-123.14 (repealed 1979)).
In the Parole Act of 1979, the Legislature adopted a "much narrower standard" for parole fitness. Trantino Parole Application, 89 N.J. at 355, 446 A.2d 104. The new statutory standard focused on likely recidivism alone:

*778 An adult inmate shall be released on parole at the time of parole eligibility, unless information supplied in the report filed pursuant to [N.J.S.A. 30:4-123.54] or developed or produced at a hearing held pursuant to [N.J.S.A. 30:4-123.55] indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the law of this State if released on parole at such time.
[N.J.S.A. 30:4-123.53a (amended 1997).]
The same standard applies to subsequent eligibility determinations as well. N.J.S.A. 30:4-123.56c.
The effect of the 1979 Act was to preclude the Parole Board from considering whether the prisoner had been sufficiently punished so as to serve society's need for deterrence and retribution. Trantino II, 154 N.J. at 27, 711 A.2d 260. Nor "was the Parole Board required to assess whether the inmate had achieved such a high level of rehabilitation that he was fit to assume a responsible role in society that was compatible with the public welfare." Ibid. While punishment was still a pertinent factor, its relevance "was limited solely to rehabilitation encompassing individual deterrence, i.e., is there a `substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole.' " Ibid. (quoting N.J.S.A. 30:4-123.56c (as amended 1997)).
The 1979 Act's standard applies to those, such as Trantino, who were serving a sentence at the time the act took effect. N.J.S.A. 30:4-123.46a; Trantino II, 154 N.J. at 27, 711 A.2d 260.
The standard was revised again in 1997. L. 1997, c. 213, § 1 (1997). The standard now requires release on parole unless the evidence "indicates by a preponderance of the evidence that the inmate has failed to cooperate in his or her own rehabilitation or that there is a reasonable expectation that the inmate will violate conditions of parole imposed pursuant to [N.J.S.A. 30:4-123.59] if released on parole at that time." N.J.S.A. 30:4-123.53a. We conclude the 1997 amendment does not apply to inmates sentenced before 1997, such as Trantino.

II
Trantino argues this court need not, and should not, consider the sufficiency of the reasons for denial offered by the Parole Board in its June 9, 1999 decision, because the Board exceeded the scope of the Supreme Court's remand by adducing evidence not in the record at the time of the Court's ruling in May 1998. Trantino contends the Court's remand limited the Board simply to apply the correct legal standard to the same record on which it made its May 1996 determination.
Trantino also argues the Board should be bound by its own 1993 ruling that he was entitled to placement in a halfway house, as a precondition of parole, and that the proper remedy at this point is for this court to order immediate release on parole with transfer to a halfway house.
The Parole Board responds that the Court did not purport to preclude the Board from considering "current information," and that the Board would have been remiss had it restricted its inquiry to a record nearly three years old.
An agency's powers on remand depend upon the contents of the court's remand order, which the agency must obey precisely; to that extent the court's remand instructions become the "law of the case." Lowenstein v. Newark Bd. of Educ., 35 N.J. 94, 116-17, 171 A.2d 265 (1961); In re Plainfield-Union Water Co., 14 N.J. 296, 302-03, 102 A.2d 1 (1954). When a court expressly disclaims the need for a new hearing, or when it explicitly limits the agency to the existing record, the limited scope of the remand has been defined. In In re Fichner, 144 N.J. 459, 677 A.2d 201 (1996), our Supreme Court remanded a disciplinary matter to the Board of Examiners and Master Plumbers *779 because of the lack of qualifications of some of the board members. The Court stated it was "not necessary to conduct a new hearing in this matter," which could be redetermined "on the basis of the existing record." Id. at 471, 677 A.2d 201.
Here, we find no clear mandate in the decision of the Court limiting the Parole Board's inquiry, on remand, to the May 1996 record. Certainly, the Court required the Board to "reconsider the evidence" and "reconsider the basic issue of whether Trantino is now ready to be paroled." Trantino II, 154 N.J. at 23, 39, 711 A.2d 260. However, these statements were made within the context of the Court's conclusion, "we do not find that the Parole Board's decision was based on a proper standard and supported by sufficient evidence and adequate findings of fact." Id. at 23, 711 A.2d 260. In our view, the Court did not preclude the Board from considering additional evidence on remand and applying the correct standard to that evidence.
Although we find no error in the Board considering additional evidence, the Board certainly was required to be mindful that the record then presented to the Court led it to conclude that Trantino's prison record "discloses substantial evidence of significant rehabilitation tending to demonstrate that Trantino has overcome any likelihood of recidivism[.]" Id. at 32, 711 A.2d 260. The Court discussed that evidence, in pertinent part, as follows:
Trantino's prison record plainly is material in determining whether he has achieved a level of rehabilitation such that he has been sufficiently deterred and there is no likelihood of recidivism. That record discloses substantial evidence of significant rehabilitation tending to demonstrate that Trantino has overcome any likelihood of recidivism. He has had no substance abuse violations in prison and no rules infractions since 1970. Trantino has already participated in sixty-nine work and recreation details that involved excursions into the community and has gone on overnight furloughs without incident. Further, he has completed seventeen programs designed to enable him to help fellow inmates and been in individual and group psychotherapy for the past twenty-five years. Finally, Trantino's supervisors in prison have consistently rendered favorable reports.
Psychological evidence also supports a determination of substantial rehabilitation militating against the likelihood of recidivism.
[Trantino II, 154 N.J. at 32-33, 711 A.2d 260 (footnote omitted).]
Moreover, the Court questioned one of the bases of the Parole Board's denial Trantino's inability to recall the facts of the crimeand observed that there was "evidence in the record" that the memory loss was genuine and that Trantino nonetheless accepted full responsibility. Id. at 34-35, 711 A.2d 260.
Alternatively, Trantino argues that, even if the Board were permitted to add to the record, it was limited to a consideration of "new information" only.
Trantino relies on N.J.S.A. 30:4-123.56c, as it read in the Parole Act of 1979. That section governed determinations of eligibility after the initial eligibility date, stating:
An inmate shall be released on parole on the new parole eligibility date unless new information filed pursuant to a procedure identical to that set forth in [N.J.S.A. 30:4-123.54 (preparole report) ] indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time. The determination of whether there is such an indication in the new preparole report or whether there is additional relevant information to be developed or produced at a hearing, and the determination of whether the inmate shall be released on the new parole eligibility date shall be made pursuant to the *780 procedure set forth in [N.J.S.A. 30:4-123.55 and -123.56].
[N.J.S.A. 30:4-123.56c (amended 1997)(emphasis added).]
In its June 1999 decision, the Parole Board gave substantial weight to Trantino's abuse of his wife in 1963, information that, according to Trantino, had been known to the Board "for decades" and, thus, certainly was not "new" within the meaning of the statute.
The Parole Board counters that, because the "new information" mandate contained in N.J.S.A. 30:4-123.56c was deleted by a 1997 amendment, the Board was not bound by it. Alternatively, the Board contends the information on which it relied in its June 1999 decision was, indeed, "new."
In 1996, Governor Whitman appointed a Study Commission on Parole. The report of the Commission acknowledged its purpose was to recommend legislation that would "enlarge the discretion of the Board to deny parole." The Commission issued various specific recommendations, including that the substantive standard for parole release "be amended to increase the discretion of the Parole Board to deny parole when an inmate has failed to cooperate in his or her own rehabilitation or when a reasonable expectation exists that the inmate would violate conditions of parole if released." The Commission perceived this recommended standard as being "far less onerous" than the existing standard in allowing the Board to prove that an inmate is not ready for parole.
Another recommendation of the Commission was that the "new information" condition be deleted from N.J.S.A. 30:4-123.56c, the Commission reasoning:
Under current law, after the first review and denial of parole, the Board panel may thereafter deny parole only if "new" information is developed in the record at the subsequent hearing that indicates there is a substantial likelihood that the inmate will commit a crime if released on parole. N.J.S.A. 30:4-123.56(c). That is one of the most significant and inappropriate limitations that existing law places on the Board's discretion.
This restriction prevents the Board from denying parole at subsequent hearings if there have been no institutional infractions committed by the inmate since his or her last review. Under current law, the Board is effectively required to grant parole, even though the inmate may not be rehabilitated. In essence, this statute treats an initial denial of parole as a "punishment" rather than as a recognition that an inmate has not earned an early release.
The statute that permits the Parole Board to use only "new" information to deny parole at a second or subsequent hearing substantially and unnecessarily limits the Board's ability to review an inmate's rehabilitation in the context of the inmate's entire record. Review of an inmate's entire record at second and subsequent hearings will allow the Board more accurately to predict an inmate's likelihood of committing another crime if released on parole. That is, the parole decision, regardless of when it is being made, should focus on whether the inmate has cooperated in the rehabilitation process and on whether he or she may be expected to violate the conditions of parole if released.
For those reasons, the Commission strongly recommends a change in the law that would allow a comprehensive review of all relevant information contained in an inmate's record, including an updated risk assessment. The Parole Board should have the ability to deny parole based on the entire record, and should not be limited to a consideration based solely on new information.
The Legislature adopted the Commission's recommendations, deleting the "new" qualifier on the kind of information needed at successive eligibility dates, and substituting the recommended standard for the former standard of likely recidivism.
*781 L. 1997, c. 213, § 2 (1997). The amended version of N.J.S.A. 30:4-123.56c, now reads:
An inmate shall be released on parole on the new parole eligibility date unless information filed pursuant to [N.J.S.A. 30:4-123.54 (preparole report) ] indicates by a preponderance of the evidence that the inmate has failed to cooperate in his or her own rehabilitation or that there is a reasonable expectation that the inmate will violate conditions of parole imposed pursuant to [N.J.S.A. 30:4-123.59] if released on parole at that time. The determination of whether the inmate shall be released on the new parole eligibility date shall be made pursuant to the procedure set forth in [N.J.S.A. 30:4-123.55] and this section.
In its statement accompanying the bill, the Assembly Law and Public Safety Committee acknowledged how the bill would change the then existing prohibition on the Parole Board's considering anything but "new information:"
Under the bill's provisions, at the second and subsequent parole hearings, the parole board would not be required to base its decision strictly on information developed since the previous denial of parole, but could consider information provided at earlier parole hearings. The Governor's Study Commission on Parole described the provision permitting the parole board to consider only new information in a subsequent parole decision as "one of the most significant and inappropriate limitations that existing law places on the board's discretion."
[Assembly Law and Public Safety Committee Statement to Assembly No. 21 (1999).]
Trantino argues that, by admitting in its decision that it had reviewed Trantino's entire life record and not just his record since his last hearing, the Board violated the law governing Trantino's parole proceedings. Trantino characterizes the Board as having "simply applied the 1997 parole standards to a case requiring 1979 treatment."
The Parole Board argues the "information" clause of the amendment to N.J.S.A. 30:4-123.56c applies to all inmates, regardless of when they were convicted, permitting the Board to consider all information, old and new, in its June 1999 decision. The Board also contends that "the old parole standardlikelihood of recidivismremains in effect" for those sentenced under Title 2A, such as Trantino.
We are in accord with the Board's position that application of the 1997 amendments to N.J.S.A. 30:4-123.56c to Trantino's parole hearing did not violate the ex post facto clause since this change in the law is a procedural modification that does not constitute a substantive change in the parole release criteria. See State v. Muhammad, 145 N.J. 23, 56-57, 678 A.2d 164 (1996); California Dept. of Corrections v. Morales, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). As we have previously noted:
[N]ot every change in parole regulation is of sufficient moment to transgress the constitutional prohibition. The ex post facto clause was surely not intended to require judicial micromanagement of an endless array of legislative adjustments to parole and sentencing procedures.
The critical inquiry is whether the statute realistically produces a sufficient risk of increasing the measure of punishment as to offend the constitutional prohibition. The United States Supreme Court has declined to articulate a single formula but instead has said the question is "one of degree." Beazell v. Ohio, 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216, 218 (1925).
[Loftwich v. Fauver, 284 N.J.Super. 530, 536, 665 A.2d 1133 (App.Div. 1995).]
We conclude the 1997 statutory amendment does not modify the parole eligibility standard applicable to Trantino; rather, it simply allows the Board to consider all *782 available evidence relevant to the application of that standard. We find no ex post facto violation.
Moreover, we are persuaded that much of the additional information considered by the Board at the remand hearings was, arguably, "new information" and could be considered by the Board even under the pre-1997 version of N.J.S.A. 30:4-123.56c.

III
Trantino's primary contention is that the Board's findings and conclusions were not supported by substantial credible evidence in the record. We agree.
In Trantino II, the Court clarified the scope of appellate review of the Parole Board's denial of parole, as follows:
(1) whether the agency's action violates express or implied legislative policies, i.e., did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[Trantino II, 154 N.J. at 24, 711 A.2d 260.]
The Court acknowledged that Parole Board decisions are "individualized discretionary appraisals" and that, therefore, they should not be reversed unless arbitrary or constitute an abuse of discretion. Id. at 25, 711 A.2d 260 (quoting Beckworth v. State Parole Bd., 62 N.J. 348, 359, 301 A.2d 727 (1973)).
However, contrary to the Parole Board's suggestion it is entitled to greater deference than other agencies, the Court confirmed that the scope of review is the same:
[T]he inherent difficulty in gauging whether a parole determination constitutes an abuse of discretion does not engender a more exacting standard of judicial review than that applicable to other administrative agency decisions.
[Trantino II, 154 N.J. at 25, 711 A.2d 260.]
The ultimate issue in a parolerelease decision is whether the inmate meets the pertinent release criteria. That issue is one of fact and, thus, subject to the traditional sufficient-credible evidence test. Id. at 24, 711 A.2d 260; N.J. Parole Bd. v. Cestari, 224 N.J.Super. 534, 547, 540 A.2d 1334 (App.Div.), certif. denied, 111 N.J. 649, 546 A.2d 558 (1988). A reviewing court must have a sense of wrongness, or a definite conviction that the decision was mistaken, which may arise from the lack of supporting evidence, the ignoring or underweighing of crucial evidence, or a clearly unjust result. Cestari, 224 N.J.Super. at 547, 540 A.2d 1334.
Moreover, in its brief the Board misstates the governing standard of parole release, stating that "any doubt about his likelihood of committing a future crime, should weigh in favor of parole denial and continued confinement." (emphasis added). The standard is much higher, in that the Board must prove by a preponderance of the evidence that there was a substantial likelihood of recidivism.
With that standard in mind, we now discuss and analyze the nine key reasons cited by the Board in support of its decision to deny Trantino parole.
1. The Talbot Hall incident.
The Board attached "significant" weight to the Talbot Hall incident and to Trantino's alleged lack of candor about it during the 1999 parole hearings. The Board explained:
The record indicates that you became upset when asked to participate in the SASSI Test at Talbot Hall in September, 1998. At your two member Panel hearing on June 4, 1999, you denied that this event ever occurred. At your full Parole [B]oard hearing less than a week later, you admit something did happen, *783 but denied it happened as was reflected in statements Chairman Consovoy read to you (a statement provided by Mr. Trabucco who conducted the testing). This exchange is reflected in Pages 234 through Page 236 of the June 9, 1999 hearing transcript. In the opinion of the Parole Board you have been less than candid about this incident and the Board finds the statements of Mr. Trabucco and Dr. Smarouk [sic], the two individuals who conducted the test, to be more credible than your statement regarding this incident.
On appeal Trantino persuasively contends the Board misinterpreted this incident. Trantino reasonably accounted for his initial denial of the incident at the June 4, 1999 hearing. The record reflects the Board was aware Trantino had not seen Smarook's report prior to the June 4, 1999 hearing when Trantino advised Board Chairman Consovoy he did not understand Consovoy's reference. As soon as Consovoy mentioned Trabucco's name at the June 9, 1999 hearing, Trantino remembered the incident and provided a reasonable explanation.
Moreover, accepting Trabucco's and Smarook's versions of the incident, the behavior they described ranked very low on any scale of negative conduct. Trabucco only stated Trantino became "perturbed" and "sort of agitated." The record reflects Trabucco expressly denied that Trantino acted violently and at no time did Trabucco "feel threatened" by Trantino. Trabucco only concluded that "given the right stresses," Trantino could resort to violence, and that there was "some" risk of recidivism. The test, however, is not whether there is "some" risk, but whether a "substantial" risk exits. Trantino II, 154 N.J. at 31, 711 A.2d 260.
Dr. Rosenfeld provided the following reaction to Trabucco's rendition of the incident:
This incident, in which Mr. Trantino became `perturbed' over the seemingly inappropriate attempt to generate pejorative psychological test data, yet was quite able to contain himself adequately and displayed only mild signs of agitation, was nevertheless offered by [Trabucco] as evidence that Mr. Trantino's control over his aggressive impulses is tenuous.
Dr. Rosenfeld's view of this incident is much more consistent with the record than the Parole Board's conclusion that the incident is a reflection of Trantino's "severe personality disorders" and that "when pressed, Trantino's eggshell exterior "cracked"[,] revealing" a Trantino who can become highly agitated and volatile." Based on our review of the record, the Board's findings and conclusions concerning this incident could not reasonably have been reached from the evidence contained in the record.
2. Trantino's parole plan.
The Parole Board found Trantino's parole plan inadequate because his prior plan had been premised on the support of his wife, from whom he is now divorced. The Board disclaimed any responsibility for crafting a parole plan, adding that its only duty was to evaluate the plan submitted by an inmate. The Board also noted that because of DOC policy to release an inmate to the county where the crime occurredhere Bergen CountyTrantino would be subjected to "heightened" scrutiny and criticism.
The Parole Board relied heavily on Trantino's divorce as a reason for denying parole, yet by Trantino's undisputed testimony it was the apparent hopelessness of parole that caused Charlee to seek a divorce. However, Trantino testified Charlee remains willing to provide Trantino with employment. Further, if Trantino is granted parole, it would be to a pre-parole halfway house, where he would be in a "controlled setting" with time to obtain employment and develop his support network. With a pre- or post-release condition of a placement to a halfway house, as well as any other special conditions of parole *784 available to the Board, the Board's conclusion that Trantino presented an uncertain parole plan is not supported by the record, when viewed in its entirety.
3. Trantino's plan to write another book.
The Board weighed against Trantino his responses to Board member Gomez's questions about Trantino's intention to write a second book:
MR. GOMEZ: The problem is basically the victims, once again, are going to suffer. You know what it is, you are going to suffer. You say you suffer about Charlee, you don't want to hear people talk about the[m], but you are willing to write a book
MR. TRANTINO: No. MR. GOMEZ:And have people suffer again?
MR. TRANTINO: No, I am not willing to do that, and that is not my intention. If I try to write a book again, and it certainly wouldn't be about their families, their family members.
MR. GOMEZ: You are missing the point.
MR. TRANTINO: I am getting the point, but it's not ...
MR.GOMEZ: You are profiting, you are profiting.
MR. TRANTINO: Yes, profiting from a crime.
MR. GOMEZ: You are talking about putting salt in people's wounds. You don't think that is putting salt in people's wounds?
MR. TRANTINO: Yes.
MR. GOMEZ: It's as simple as that.
TRANTINO: I was not thinking about that.
MR. GOMEZ: The last question.
MR. TRANTINO: I was thinking
MR. GOMEZ: Continue if you want, I only have one more question.
MR. TRANTINO: Go ahead.
From this colloquy the Board concluded Trantino's professed empathy for the families of his victims was not genuine, stating:
Perhaps no other conversation at your hearing on June 9, 1999 exemplifies areas in which you have not made great changes, than your conversation with Mr. Gomez regarding the possibility of you writing a book if you were paroled. Subsequent to writing the book Lock the Lock in 1973, you became aware of the pain and trauma that this book caused to the family members of the victims, yet you have explained to Board Members in the past that you have great empathy for family members of the victims.
Trantino contends that to penalize him for writing a book would run contrary to his First Amendment right of free speech. Putting aside any First Amendment implications, we conclude the Board's finding could not be reasonably reached from the record, given the context of Trantino's testimony as a whole about his book plans. Based on this colloquy with Board member Gomez, we note Trantino did express sensitivity to the families of the victims, and expressly denied any intention to hurt them, although he conceded another book might put "salt in people's wounds." When Trantino attempted to explain he was "not thinking about that," Gomez went on to another topic.
Moreover, the Board's findings on this issue neglected to consider Trantino's later testimony, concerning the second book:
MR. TRANTINO: And a book, now the book I'm taking very seriously what Mr. Gomez said and what you are saying here.
MR. CONSOVOY: Please do.
MR. TRANTINO: I never, it doesI have expressed this to you over many times about the families here, it really does hurt me, I had a mother, that could have been my mother, it could have just been the opposite thing, I know the sorrow that the kind of feelings they have, I wouldn't want to *785 hurt them. What I would be doing would not be to hurt them.
....
MR. TRANTINO: What you just said bothered me a lot, about the families. It just brought up stuff, you know, I work on that, and it hurts. I don't want to hurt them. And now I have toI am going to rethink about the book. After what you and Mr. Gomez pointed out, that bothered me a lot. I more than anything, I'm sorry for what I did, I shot and killed two people. And it wasn't only their lives I took, their families, their families as well were affected right to this day, as you are pointing out here. And that is something that I try to live with, I try to deal with, I try to heal, I am ashamed of that.
Viewing Trantino's comments in their entirety, the Board's finding that Trantino's plans for a second book evince a lack of empathy for the victims' families could not be reasonably reached on this record.
4. Trantino's characterization of his 1956 robbery conviction.
The Board also accorded substantial weight to Trantino's alleged downplaying of his 1956 robbery conviction. The Board summarized that incident, as follows:
Records indicate on February 16, 1956, you and a co-defendant, George Fernandez, accosted a twenty-one year old dental assistant, Carmella DeVito, and stole $500.00 of payroll money from the dental office Ms. DeVito worked at. Records indicate that when Ms. DeVito approached you and your co-defendant, your co-defendant placed his hands over Ms. DeVito's eyes and mouth. You then pulled Ms. DeVito down and located a payroll envelope in her pocket. Ms. DeVito struggled and was pushed up against a wall. Ms. DeVito and your codefendant then fell on the tile floor. Ms. DeVito screamed and then you and your co-defendant released her. You and your co-defendant would subsequently be arrested for this offense and your codefendant would admit to committing twenty-five burglaries prior to this incident and several of the burglaries in your company. As a result of the assault, Ms. DeVito received a black eye, bruises and later suffered from somatic pains, lack of sleep and nightmares as a result of this incident. You would later be indicted for first degree robbery, first degree grand larceny and second degree assault. On June 18, 1956, as the result of a plea bargain, you were given a five to ten year sentence for second degree robbery.
The Board noted that at parole hearings in 1990, and again in June 1999, Trantino denied he had harmed the victim. At the June 9, 1999 hearing, Trantino conceded the robbery was a "violent crime," but he denied the victim had been hurt.
Later in the same hearing, Board Chairman Consovoy read to Trantino from a New York probation report about the incident, which disclosed the victim had "suffered a black eye and received black and blue bruises being caused by being thrown against the wall to the floor." Trantino responded that he never knew the victim had been injured, stating "that's the first time I ever heard that." Trantino again acknowledged it was "a violent crime."
In its decision, the Board found it "especially disconcerting" that "for many years" Trantino had denied the violent nature of the 1956 offense, stating, "[a]s reflected in the official accounts of this offense, the offense was violent in nature and in the opinion of the Parole Board you have mitigated the extent of violence in this act."
However, we note Trantino confessed fully to the 1956 crime when apprehended, pled guilty, and consistently described the act as violent and, when confronted with the extent of the victim's injuries, was shocked and remorseful. The Board's findings on this point fail to reflect the *786 context of that incident, as reflected in the record.
Additionally, Trantino's lack of knowledge, before June 9, 1999, that the victim had been injured, renders his denial of that fact during prior proceedings irrelevant to his recidivism prospects. Moreover, even if he did know, his mitigation of that portion of an offense committed at age eighteen, some forty-three years earlier, fails to demonstrate he would probably commit another crime now, especially when viewed in the light of his consistent admission to the offense, and his concession that it was "violent." Furthermore, the excerpt from the New York probation report relied upon by the Board suggests it was Trantino's accomplice, Fernandez, who fell to the floor with the victim, and that Trantino's own role was limited to patting her down and locating the payroll envelope. There is nothing in the report to support the Board's conclusion that it was Trantino who "pulled" the victim "down."
5. Trantino's alleged memory loss.
In its decision, the Board reviewed Trantino's evolving acceptance of his role in the killings, ranging from wholesale denials in 1964, 1967, 1980, and 1982, to admission of responsibility in 1999. Regardless of Trantino's acceptance of responsibility, the Board expressed concern about Trantino's past lack of candor, which it characterized as "an ongoing pattern of deception." The Board rejected the Supreme Court's finding that Trantino's inability to recall the details was "consistent, long-standing, and genuine." See Trantino II, 154 N.J. at 35, 711 A.2d 260.
Notwithstanding the Board's disagreement with the Court, the Board's finding on this issue is unsupportable by the record. It was undisputed that Trantino was drunk and under the influence of Dexedrine at the time of the killings. Dr. Ferguson's 1995 report acknowledged the likely effect of Trantino's impaired state in the following excerpt:
Thomas also described vivid visual hallucinations on the night of the present offense which have previously been called into question, as to their authenticity, particularly in light of his inability to recall the offense itself. While it is unquestionable that hallucinations can be fabricated, given the extent of his alcohol and amphetamine consumption at the time, it is also quite conceivable that Thomas was experiencing a drug induced psychotic state when he committed the offense. The existence of a psychotic break could also explain how Thomas could commit a crime, so contrary to his moral character. The incongruence between his moral values and the brutality of his actions during the offense may also explain the level of repression that Thomas reports for the actual offense itself, while retaining clear memories of events both prior to and following the actual offense.
We find nothing in the record of the remand proceedings before the Board tending to refute the Court's finding on the genuineness of Trantino's past lack of memory and ultimate acceptance of personal responsibility. Admission of fault may be considered as a key component of readiness for parole. However, as noted by the Court, to require a detailed recollection in Trantino's case would serve no legitimate purpose:
While it may be appropriate in other cases involving pre-Code inmates to insist upon evidence of subjective awareness of guilt before concluding that an inmate's avowal of responsibility is sincere and that he is rehabilitated to the point that he will not commit crimes if released, such an insistence may be unwarranted in this case where, we repeat, the record supports the finding that Trantino cannot and will not ever be able to remember actually pulling the trigger. The record thus does not clearly sustain the conclusion that long-term psychotherapy will eventuate in a breakthrough recollection or that such a recollection *787 is necessary, given Trantino's repeated acceptance of responsibility, in order to ensure that he has achieved a level of rehabilitation that eliminates the likelihood that he will, if released, commit crimes.
[Trantino II, 154 N.J. at 38, 711 A.2d 260.]
Given the record presented, as well as the Court's finding on this issue, the Board could not reasonably rely on Trantino's alleged memory loss to support its denial of parole.
6. Trantino's violation of his New York parole.
In its June 1999 decision, the Parole Board devoted several pages to Trantino's New York parole history between 1960 and 1963. The Board cited that history as an example of Trantino's lack of candor, which reflected negatively on his present suitability for parole:
It is clear based on a review of your New York parole records, you did not follow conditions of parole placed on your [sic] by New York paroling authorities. In addition to resorting to criminal behavior with known criminal associates while on parole, records indicate you lied to parole officials in New York when you were hiding Falco and Cassarino, both wanted for murder, prior to the murder in Lodi. The Parole Board also notes your statements to New York paroling authority prior to parole release in 1961 and your subsequent failure to follow through on your commitment to the New York paroling authority, as reflected earlier in this notice of decision.
Trantino conceded he violated his New York parole, but argues the Board ignored the significant evidence available demonstrating he had changed during his New Jersey incarceration. Trantino cited his lack of prison infractions, helping other inmates, and good performance on all work details.
The Board failed to reasonably explain how Trantino's conduct in the early sixties could reveal his suitability for parole in 1999, when the only relevant inquiry before the Board was whether Trantino was likely to commit another crime. On two prior occasions, the Board found there was no danger in releasing Trantino on parole in 1980 or to a halfway house in 1991, 1993, and 1994. Moreover, in its latest decision, the Board stated it had no doubt Trantino was "not the same person" he was in 1963, citing several examples of his "significant strides over the last thirty-six years to reduce the likelihood of future recidivism." In the light of these findings and the record before us, the conclusion by the Board that Trantino's conduct while on parole in New York some thirty-six to thirty-nine years earlier supports his denial of parole could not reasonably have been reached, and fails to apply the appropriate standard for parole. It would be virtually impossible for any inmate to win parole release if his past life were allowed to override successful efforts at rehabilitation.
7. Trantino's lack of candor regarding his 1974 attempts to to remove a New York detainer.
In 1973, Trantino became eligible for "full minimum status," but the existence of a New York parole detainer prevented his transfer to a less secure facility or his assignment to a job outside the prison. Trantino's counsel at the time, Jeff Fogel, unsuccessfully requested that New York lift the detainer. Fogel then contacted a New York attorney, Sanford Katz, who was also unsuccessful. In 1976, the New York parole authorities lifted the detainer on their own.
At the June 9, 1999 hearing, Trantino denied any knowledge of Katz's role, recalling only that Fogel was the one who represented him. In its decision, the Board considered this as another example of Trantino's lack of candor, stating:
The issue involved in this discussion was your role in 1974 in attempting to have *788 New York parole authorities remove a detainer issued for pending parole violation charges dating back to 1963 that would never be adjudicated as the result of the work of your retained attorney. You explained at your June 9, 1999 hearing that you were not aware your attorneys were attempting to have New York's parole warrant removed, despite the fact that letters indicate that you did retain a Mr. Katz to represent you in this matter. In sum, the Parole Board believes you were being less than candid regarding this issue. Perhaps this was a miscommunication between you and your attorney so therefore if you can provide the Board an affidavit from Mr. Katz stating that his letter to New York parole authorities dated August 30, 1974, in which he claims he was retained by you, was false the Board will reconsider our position.
In response to the Board's invitation, in December 1999, Trantino obtained a certification from Katz affirming that he dealt with Fogel and not with Trantino. Trantino also obtained a certification of Fogel, in which he stated he did not recall telling Trantino about Katz.
It is not clear whether these certifications were filed with the Board or simply appended to Trantino's brief on appeal. However, we note the Board does not rely on this factor in the arguments presented in its brief. In any event, we conclude Trantino's failure to remember Katz cannot possibly reflect such a lack of candor as would demonstrate likely recidivism, nor is such a conclusion supported by the evidence in the record before us.
8. Trantino's childhood employment.
Dr. Rosenfeld's January 1999 report indicated Trantino advised Dr. Rosenfeld he had "worked steadily from age 7 until approximately 14 years old." In its decision, the Board found that statement was contradicted by "King's County Probation Reports," thereby reflecting Trantino's lack of candor. In its summary of those probation records, however, the Board did not state that the reports contained any information about Trantino's employment between the ages of seven and fourteen. Rather, the Board referred only to Trantino's failure to obtain employment at age sixteen. The excerpt from the probation report provided by Trantino indicates the report only discussed his "scanty" employment in 1956, when he was age eighteen.
It appears the Board's finding on this point may have been based on a mistaken reading of the reports. Nevertheless, we conclude Trantino's alleged misrepresentation of his employment status as a child could not reasonably constitute evidence reflecting on his recidivism prospects at age sixty-one.
9. Dr. Ferguson's change of opinion between 1995 and 1999.
The Parole Board "relied heavily" on Dr. Ferguson's testimony during his two appearances before it in June 1999. The Board was especially impressed with Dr. Ferguson's opinion, as reflected in a Confidential Memorandum, that the combination of Trantino's narcissism and borderline personality traits created, as found by the Board, "a strong possibility of future violent behavior."
We cannot ignore the fact that the record reflects that until his June 1999 appearance before the Board, Dr. Ferguson was, in effect, "a forceful advocate" of parole for Trantino. In his 1995 report, Dr. Ferguson found it "quite conceivable" that Trantino had committed the murders while under a "drug induced psychotic state," and that his brutal crime was "contrary to his moral character." Dr. Ferguson recommended parole and opined there was a high probability of success, with or without a halfway house placement. Dr. Ferguson did, however, feel Trantino's then strong support network was crucial to the chances for success.
*789 In its 1998 decision, the Court acknowledged the recommendations of Dr. Ferguson and another psychologist, concluding that, while those recommendations were not dispositive, the Board had failed to justify its rejection of them. Trantino II, 154 N.J. at 36, 711 A.2d 260.
In Dr. Ferguson's 1998 report, solicited for the remand proceeding, he described some anti-social and other negative traits revealed by a Rorschach test and another psychological test. Nonetheless, Dr. Ferguson found Trantino did not present "an imminent risk for parole violation, or violent recidivism if released." Dr. Ferguson recommended a halfway house placement with continued counseling.
In his June 1999 appearances before the Board, Dr. Ferguson testified contrary to his prior findings and reports. Dr. Ferguson testified he felt Trantino was "dangerous," and agreed with Board Chairman Consovoy that Trantino's narcissism, when combined with his borderline personality, could lead to an explosion. Dr. Ferguson framed his opinion in terms of potential violence, stating Trantino's personality traits "might set him off." In his testimony, however, Dr. Ferguson did not recant the statement contained in his August 1998 report that Trantino did not present an imminent risk of parole violation or violent recidivism. In its decision, the Board converted that "potential," as expressed by Dr. Ferguson, into a "strong possibility of future violent behavior," stating:
What is of concern now is the inmate's narcissistic personality combined with his unaddressed borderline personality disorder that, in the opinion of the Board Members, create a strong possibility of future violent behavior. As Chairman Consovoy noted at the conclusion of the inmate's June 9, 1999 hearing, in many very important ways, the inmate is the same from a psychological aspect as he was in 1963 when he committed two murders.
In Cestari, we disapproved of the Board's reliance on a single psychologist's opinion that was cast in terms of "potential," instead of in terms of the proper standard of "substantial recidivism," noting:
Although Dr. Rotgers' report was unfavorable to Cestari, it did not say that there was a "substantial likelihood" he would commit another crime if released. Dr. Rotgers only concluded that "Mr. Cestari must still be considered to have the potential to become involved in a violent incident in the future." Rotgers' opinion that Cestari has "the potential to become involved in a violent incident" does not mean that there is a "substantial likelihood" he will commit another crime. Indeed, it could be accurately said that nearly all violent offenders, and many persons who have never been convicted of violent offenses, have the "potential" to become involved in a violent incident. It is only when that "potential" rises to the level of a "substantial likelihood" that another crime will be committed that parole may be denied. Thus, the Adult Panel read more into Dr. Rotgers' solitary negative evaluation of Cestari than actually is stated in his report.
[Cestari, 224 N.J.Super. at 550, 540 A.2d 1334.]
Here, as in Cestari, "there was substantial other evidence of the likelihood of [Trantino] succeeding on parole," including his good behavior in prison and during out-of-prison work details, and the favorable reports of other psychologists, including Dr. Ferguson's own 1998 report. See id. at 550-51, 540 A.2d 1334.
The findings and conclusions of the Board on this issue could not reasonably have been reached based on the relevant facts contained in the record. We are persuaded that the Board failed to consider the overall context of Dr. Ferguson's involvement in this case and placed undue emphasis on Dr. Ferguson's testimony of a "potential" for violence by concluding there was a "strong possibility" of violence *790 by Trantino if paroled. The conclusions did not adequately consider the substantial and positive factors present, and did not fully explain its rejection of the information contained in Dr. Rosenfeld's favorable reports.
We have thoroughly reviewed and considered the findings of the Board and conclude the findings of the Board used to support its denial of parole to Trantino could not have been reasonably reached based upon the evidence contained in this record. The record fails to establish that there is a substantial likelihood that Trantino will engage in criminal conduct if released on parole. The Board's overall reasoning conveys a "sense of wrongness," within the meaning of Cestari, 224 N.J.Super. at 547, 540 A.2d 1334. An application of the standards and laws governing parole to this record requires our intervention and reversal of the denial of parole to Thomas Trantino.

IV
Trantino asserts a collection of procedural breaches, any or all of which, he argues, require that the Board's denial decision be reversed. Trantino also marshals an array of constitutional theories he contends supports reversal. In view of our decision to reverse the Board's denial of parole on the basis the Board's decision is not supported by substantial credible evidence in the record, we need not address these arguments.

V
In summary, we reverse the Board's denial of parole and its establishment of a twenty-year FET and remand the matter to the Parole Board and direct that parole be granted. However, release on parole shall not take place until thirty days have elapsed from the date of this opinion, during which time the Board shall establish such post-release conditions as it concludes are necessary and appropriate. During this thirty-day period, the Board may also take steps to effect his out-of-state placement.
We also remand this matter to the Department of Corrections and direct that Trantino be immediately placed in a preparole halfway house or residential facility, in preparation for his aforesaid release on parole in thirty days.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] Trantino filed a separate appeal from the decision of the Department of Corrections transferring him from Talbot Hall to South Woods State Prison, docketed as No. A-1692-98T2. That appeal was argued before us on October 20, 1999, and by order entered on November 10, 1999, we decided to defer decision on that appeal until we had heard and considered this appeal.
[2] Apparently Dr. Welner recommended against release but, citing various weaknesses in his evaluation, the Board gave it "no weight."